LMC COMPLETE AUTOMOTIVE,
INC., Appellant,

v.

Ronald BURKE, Appellee.

Nos. 01–06–00694–CV, 01–07–00126–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

June 21, 2007.

Clifford L. Harrison, Harrison, Bettis, Staff, McFarland & Weems, L.L.P., Houston, for Appellant.

John C. Hampton, D. Matthew Freeman, Matt Freeman & Associates, Houston, for Appellee.

Panel consists of Justices NUCHIA, HANKS, and BLAND.

## OPINION

JANE BLAND, Justice.

In this nonsubscriber negligence case, LMC Complete Automotive, Inc. (LMC) appeals a jury verdict and judgment of $155,000 in favor of its employee, appellee Ronald Burke. LMC contends (1) the evidence is legally insufficient to support the jury's negligence finding, (2) Burke's causation evidence is not sufficiently reliable to support the jury's negligence finding, and (3) the trial court abused its discretion in excluding evidence that Burke received compensation for his injury from collateral sources. We conclude that the evidence is legally sufficient and sufficiently reliable to support the jury's negligence finding, and the trial court did not abuse its discretion in excluding the evidence that Burke received compensation for his injury from collateral sources. We therefore affirm the trial court's judgment.

We also address LMC's motion, filed in this court, to waive or decrease the security required to suspend enforcement of the trial court's judgment on appeal, as well as LMC's contest of the trial court's findings of fact on the security issue. With respect to the amount of a supersedeas bond, we conclude that the record does not support the trial court's findings that LMC has sufficient net worth to secure the full amount of the judgment while the case is on appeal. Pursuant to Rule 24 of the Texas Rules of Appellate Procedure, we set LMC's net worth at $149,736.04, vacate the trial court's July 25, 2006 order denying LMC's motion to decrease the security required to suspend enforcement of the

judgment, and order that the security for supersedeas for LMC be set at $74,868.02, fifty percent of LMC's net worth. Our order entered on February 15, 2007, staying the enforcement of the judgment in this case, will remain in effect for fifteen days after the date this opinion is issued to allow the parties to seek further review of our security determination. We dismiss LMC's second appeal, related to the trial court's findings of fact on the security issue, for want of jurisdiction.

## Background

LMC is an auto repair shop. Burke worked for LMC as a body repair man. Mario Ramirez also worked for LMC, as a porter, and his job duties included cleaning and moving vehicles around the shop.

We recite the facts, which were hotly contested at trial, in a light favorable to the jury's verdict. In April 2003, Burke was working on a vehicle at LMC when he heard a noise. Burke looked up and saw another vehicle rolling out of the shop with the driver's side door open. Ramirez was hanging onto the door and the steering wheel and the vehicle was dragging him outside. Apparently, Ramirez was attempting to push the vehicle into the shop by himself when he lost control of it. Burke ran in front of the vehicle and stopped it by hand. Burke immediately experienced pain in his back, but he initially thought that he had just strained some muscles. Ramirez, Burke, and a third employee then pushed the vehicle into the shop. Burke told a manager about the incident and went home immediately because of his back pain. Burke eventually sought medical treatment, including two back surgeries, due to the injury.

Before the incident with the vehicle, Burke witnessed Ramirez engage in other negligent acts while working at LMC. On one occasion, Ramirez drove an SUV into

the shop too quickly, but Burke managed to stop him just before he ran over another employee. On another occasion, Ramirez placed an open can of gasoline near an employee who was welding. Burke quickly moved the can to prevent an accident. On a third occasion, Burke saw Ramirez using an electric buffer with the extension cord running through a pool of water. Burke warned Ramirez to move the extension cord but he continued buffing. Burke reported each of these incidents to management at LMC, but he never saw anyone say anything to Ramirez. LMC did not hold organized safety meetings.

### Negligence

In its first issue, LMC contends the evidence is legally insufficient because no evidence exists to support the jury's negligence or proximate cause findings. In its second, related issue, LMC contends that it was entitled to a JNOV because the treating physician's expert testimony as to the cause of Burke's injuries is unreliable.

### A. Standard of Review

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). In making this determination, we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* at 822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. Although we consider the evidence in a light most favorable to the challenged findings, indulging every reasonable inference that

supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

### B. Nonsubscribers and Negligence

LMC is a nonsubscriber to the Texas Workers' Compensation Act. TEX. LAB. CODE ANN. § 406.002 (Vernon 2006) ("Except for public employers and as otherwise provided by law, an employer may elect to obtain workers' compensation insurance coverage."). "In an action ... against an employer who does not have workers' compensation insurance coverage, the plaintiff must prove negligence of the employer or of an agent or servant of the employer acting within the general scope of the agent's or servant's employment." *Id.* § 406.033(d) (Vernon 2006). Contributory negligence is not a defense in nonsubscriber cases. *Id.* § 406.033(a)(1); *Kroger Co. v. Keng*, 23 S.W.3d 347, 352 (Tex.2000).

■ A negligence cause of action has three elements: (1) a legal duty owed by one person to another, (2) a breach of that duty, and (3) damages proximately caused by the breach. *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex.2002). "Proximate cause requires both cause in fact and foreseeability." *Id.* Foreseeability exists if the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act creates for others. *Id.* "Foreseeability does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence." *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex.1992). "Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury which would not otherwise have occurred." *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995); *accord Henry v. Houston Lighting & Power Co.*,

934 S.W.2d 748, 750 (Tex.App.-Houston [1st Dist.] 1996, writ denied).

■■■ An employer has a duty to use ordinary care in providing a safe workplace. *See Kroger Co. v. Elwood,* 197 S.W.3d 793, 794 (Tex.2006); *Farley v. M M Cattle Co.,* 529 S.W.2d 751, 754 (Tex. 1975). "It must, for example, warn an employee of the hazards of employment and provide needed safety equipment or assistance." *Elwood,* 197 S.W.3d at 794; *Farley,* 529 S.W.2d at 754. An employer must furnish safe machinery and instrumentalities with which its employees are to work and provide adequate assistance under the circumstances for the performance of required work. *See Humble Sand & Gravel, Inc. v. Gomez,* 146 S.W.3d 170, 186 n. 45 (Tex.2004); *Werner v. Colwell,* 909 S.W.2d 866, 869 (Tex.1995); *Farley,* 529 S.W.2d at 754. An employer must also instruct employees in the safe use and handling of products and equipment used in and around an employer's premises or facilities, and adequately hire, train, and supervise employees. *Patino v. Complete Tire, Inc.,* 158 S.W.3d 655, 660 (Tex.App.-Dallas 2005, pet. denied); *Castillo v. Gared, Inc.,* 1 S.W.3d 781, 786 (Tex.App.-Houston [1st Dist.] 1999, pet. denied).

■■■ An employer, however, is not an insurer of its employees' safety. *Elwood,* 197 S.W.3d at 794; *Leitch v. Hornsby,* 935 S.W.2d 114, 117 (Tex.1996); *Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 21 (Tex.1993). An employer owes no duty to warn of hazards that are commonly known or already appreciated by the employee and no duty to provide equipment or assistance that is unnecessary to the job's safe performance. *Elwood,* 197 S.W.3d at 794–95. An employer also has no duty to provide assistance if an employee's injury results from performing the same character of work that employees in that position have always done, and there is no evidence that the work is unusually precarious. *Id.* at 795; *Werner,* 909 S.W.2d at 869.

### C. Evidence of Negligence

■■■ The evidence Burke presented is legally sufficient to support the jury's negligence finding. The evidence is undisputed that both Ramirez and Burke were employees of LMC in April of 2003.

Burke's status as an employee of LMC gave rise to LMC's duty to exercise ordinary care in providing a safe workplace. *See Elwood,* 197 S.W.3d at 794; *Farley,* 529 S.W.2d at 754. Ramirez was acting in the course and scope of his employment when he was pushing the vehicle because his duties included moving vehicles around LMC's premises. The evidence is also undisputed that LMC did not hold safety meetings or train its employees on how to move vehicles. The jury was entitled to conclude that Ramirez was negligent in losing control of a vehicle while standing outside the vehicle to move it, and in failing to use ordinary care to ensure that the vehicle was moved safely within LMC's premises. *See, e.g., Brookshire Grocery Co. v. Goss,* 208 S.W.3d 706, 723 (Tex.App.-Texarkana 2006, no pet.) (evidence was legally sufficient to support finding that employer breached its duty to provide safe workplace). Because Ramirez was an employee acting in the course and scope of his employment, his negligence constituted a breach of LMC's duty to use ordinary care in providing a safe workplace. *See* TEX. LAB.CODE ANN. § 406.033(a)(3) (Vernon 2006) ("In an action against an employer who does not have workers' compensation insurance coverage to recover damages for personal injuries or death sustained by an employee in the course and scope of the employment, it is not a defense that ... the injury or death was caused by the negligence of a fellow employee."); *Elwood,* 197 S.W.3d at 794

(holding that employer has nondelegable duty to provide safe workplace). Additionally, based on LMC's knowledge of Ramirez's previous action in nearly losing control of a vehicle within the shop, the jury was rationally justified in finding that moving vehicles within LMC's premises posed a foreseeable risk of harm to nearby employees. *See Travis,* 830 S.W.2d at 98 ("Foreseeability does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence."). We hold that the evidence presented would enable reasonable and fair-minded people to reach the verdict under review. *See City of Keller,* 168 S.W.3d at 827. The evidence is therefore legally sufficient to support the jury's negligence finding.

### D. Causation and the Reliability of the Expert Testimony

LMC contends that Burke's expert evidence that Ramirez's negligence in losing control of a moving vehicle caused Burke's back injury is not sufficiently reliable to support the jury's negligence finding, and that no evidence supports the jury's causation finding. Burke underwent two back surgeries after the accident at LMC. Dr. Thomas Mims was one of Burke's treating physicians and he participated in both of Burke's surgeries. Burke told Mims that he thought the accident at LMC might have caused his back injury. Burke also testified that he never experienced back pain before the accident. A myelogram X-ray of Burke's lower back revealed that he had a herniated disc. Mims testified that the accident at LMC could have caused Burke's injury, and the injury was consistent with the accident. Mims also testified that, within a reasonable degree of medical certainty, the accident at LMC caused Burke to have to undergo the two surgeries. Mims testified that it is common for doctors to rely on the reports of patients in determining the cause of an injury.

LMC asserts that Mims's testimony is unreliable because he based his causation opinion on Burke's statements instead of entirely scientific proof. The following exchange occurred at trial:

[Defense Counsel:] Can you point to any scientific evidence that any of the treatment that was provided to Mr. Burke was necessitated by something that happened on April the 11th, 2003?

[Dr. Mims:] Counselor, I'm not really sure—can you phrase your question in another way?

[Defense Counsel:] I don't know. What—help me a little bit.

[Dr. Mims:] Well, scientific evidence, we have got a gentleman with a ruptured lumbar disc. We have got a gentleman that was in severe pain. And he says it occurred when it [sic] had the accident. I mean, I wasn't there. We don't have an MRI scan directly before that particular injury. We are having to rely upon his statements. Scientific evidence—other than an MRI scan that shows, an MRI scan, a myelogram that shows a ruptured disc, under that kind of a context, no. I don't know that I can say that he would have any scientific evidence. But that would be the way it would be, you know, implicating at least that particular injury, other than the fact that throughout the years, we know that you can hurt your back with any type of an injury, including the type was [sic] described.

[Defense Counsel:] Do I understand you to say that you are basing your opinion that this man's medical treatment was necessitated by something that happened on April of 2003, that that opinion is based on what he told you?

[Dr. Mims:] Based upon what he said as time went on, that this is how he hurt his back, yeah.

[Defense Counsel:] Okay. Now that's not scientific, though, is it?

[Dr. Mims:] No.

To establish causation in a personal injury case, a plaintiff must prove the defendant's conduct caused an event, and that event caused the plaintiff to suffer compensable damages. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995). The causal link between the event sued upon and the plaintiff's injury must be shown by competent evidence. *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 732 (Tex.1984). A jury may decide the required causal nexus between the event sued upon and the plaintiff's injuries when (1) general experience and common sense will enable a layperson fairly to determine the causal nexus; (2) expert testimony establishes a traceable chain of causation from injuries back to the event; or (3) expert testimony shows a probable causal nexus. *Keo v. Vu*, 76 S.W.3d 725, 731 (Tex.App.-Houston [1st Dist.] 2002, pet. denied); *Weidner v. Sanchez*, 14 S.W.3d 353, 370 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *see also Morgan*, 675 S.W.2d at 732.

To constitute evidence of causation, a medical expert's opinion must rest in reasonable medical probability. *Crye*, 907 S.W.2d at 500; *Ins. Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966). This rule applies whether the opinion is expressed in testimony or in a medical record, as the need to avoid opinions based on speculation and conjecture is identical in both situations. *Crye*, 907 S.W.2d at 500. Reasonable probability is determined by the substance and context of the opinion and does not turn on semantics or on the use of a particular term or phrase. *Id.; Myers*, 411 S.W.2d at 713.

An expert must base his opinion on facts or data perceived or reviewed during or before trial. Tex.R. Evid. 703; *Onwuteaka v. Gill*, 908 S.W.2d 276, 283 (Tex.App.-Houston [1st Dist.] 1995, no writ). The weakness of facts in support of an expert's opinion generally goes to the weight of the testimony rather than the admissibility. *Onwuteaka*, 908 S.W.2d at 283. Nevertheless, an expert's opinion regarding causation that is based completely upon speculation and surmise amounts to no evidence. *Id.; see also Schaefer v. Tex. Employers' Ins. Ass'n*, 612 S.W.2d 199, 204–05 (Tex.1980) (holding that expert's medical opinion constituted no evidence because it was based upon speculation and surmise rather than reasonable medical probability). "If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex.1997). Expert testimony is unreliable if "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex.1998) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997)). "We are not required ... to ignore fatal gaps in an expert's analysis or assertions that are simply incorrect." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 912 (Tex.2004).

Here, Dr. Mims testified that he is a board certified neurosurgeon and has been practicing for over twenty years. As a neurosurgeon, Mims treats back injuries. Mims participated in both of Burke's back surgeries, and testified that he has performed the same types of surgeries many times on other patients. Specifically,

Mims testified that he has performed Burke's first surgery about 1500 times, and the second surgery about 150 times. Mims took a medical history from Burke and examined him on multiple occasions. The record therefore includes evidence that Burke's injury was within Mims's realm of expertise. *Cf. Gammill,* 972 S.W.2d at 719 (holding that district court did not abuse its discretion in excluding testimony of mechanical engineer in products liability case involving automobile because expert did not have specific experience regarding subject matter of lawsuit); *Broders v. Heise,* 924 S.W.2d 148, 149 (Tex.1996) (holding that district court did not abuse its discretion in excluding plaintiffs' expert's opinion on causation because while expert plainly had greater knowledge of medicine generally than lay person, he did not have specialized knowledge on precise subject of causation).

Mims testified that it is common for doctors to rely on a patient's history in determining the cause of an injury. *See* TEX.R. EVID. 703. Burke told Mims that he thought the accident at LMC might have caused his back injury, and he started experiencing pain in his back after the accident. A myelogram X-ray of Burke's lower back revealed that he had a herniated disc. Mims testified that within a reasonable degree of medical certainty, the accident at LMC caused Burke to have to undergo the two surgeries. *See Crye,* 907 S.W.2d at 500.

The evidence presented demonstrates that Burke's causation opinion is sufficiently reliable to support the jury's negligence finding. *See Gammill,* 972 S.W.2d at 727; *E.I. du Pont de Nemours Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995). The fact that Mims did not base his causation opinion on MRIs taken immediately before and after the accident does not make the opinion unreliable or unscientific. While the source of Mims's causation opinion was based in part on the history the patient presented, the opinion constitutes competent evidence when coupled with confirming medical evidence such as the results of medical tests and examination.

LMC asserts that Burke's statements are incredible because he first went to a doctor for his back pain three months after the accident at LMC, but consistently reported to his doctors that he had been experiencing back pain for about nine months. Burke testified at trial that he is not very good at remembering exact dates, and had no reason to think that his doctors needed the precise date his injury occurred. In any event, Burke's inability to recall the exact date on which he was injured does not make his eventual statement to Mims regarding the source of his injury inherently unreliable. *See Keo,* 76 S.W.3d at 734–35 (holding that expert's causation opinion, based on statements made by plaintiff, was not inherently unreliable). It was up to the jury to determine whether Burke's explanation was credible. We hold that the credibility of the patient history Burke gave to Mims was a fact issue that goes to the weight, rather than the admissibility, of Mims's causation opinion. *See id.; Onwuteaka,* 908 S.W.2d at 283. Burke's statements to Mims were not so inherently unreliable that they cannot support a medical opinion. *See Havner,* 953 S.W.2d at 714 ("If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable."). We therefore hold that Mims's causation testimony was legally sufficient, and sufficiently reliable to support the jury's negligence finding. *See City of Keller,* 168 S.W.3d at 827; *Gammill,* 972 S.W.2d at 727; *Robinson,* 923 S.W.2d at 557.

## Collateral Source Rule

In its third issue, LMC contends the trial court abused its discretion in excluding evidence that Burke received partial compensation for his injuries from collateral sources; namely, his wife's health insurance policy. LMC contends that Burke opened the door to this evidence when he testified about financial hardships caused by his injury.

■■■ We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Id.*

■■■ "The collateral source rule is both a rule of evidence and damages." *Johnson v. Dallas County*, 195 S.W.3d 853, 855 (Tex.App.-Dallas 2006, no pet.); *Taylor v. Am. Fabritech, Inc.*, 132 S.W.3d 613, 626 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). Generally, the collateral source rule precludes a tortfeasor from obtaining the benefit of, or even mentioning, payments to the injured party from sources other than the tortfeasor. *Johnson*, 195 S.W.3d at 855; *Taylor*, 132 S.W.3d at 626. "In other words, the defendant is not entitled to present evidence of, or obtain an offset for, funds received by the plaintiff from a collateral source." *Johnson*, 195 S.W.3d at 855; *Taylor*, 132 S.W.3d at 626. A claim of financial hardship, however, may open the door to collateral source evidence to impeach the credibility of the witness. *See Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 423 (Tex.App.-Eastland 2006, no pet.); *Taylor*, 132 S.W.3d at 628; *Macias v. Ramos*, 917 S.W.2d 371, 374 (Tex.App.-San Antonio 1996, no writ). Before the trial court allows impeachment evidence, the witness must offer direct testimony inconsistent with the receipt of benefits. *See Snyder,*

191 S.W.3d at 423; *Mundy v. Shippers, Inc.*, 783 S.W.2d 743, 745 (Tex.App.-Houston [14th Dist.] 1990, writ denied); *J.R. Beadel Co. v. De La Garza*, 690 S.W.2d 71, 74 (Tex.App.-Dallas 1985, writ ref'd n.r.e.).

■■■ In this case, Burke testified to the financial hardship caused by his injury, but his testimony was limited to the hardship caused by his reduced earning capacity. The following exchange occurred at trial:

[Plaintiff's Counsel:] Now, Ronnie, after all of this, how much do you make now working with Bennett?

[Burke:] About twenty, about 20,000 and glad to have it.

[Plaintiff's Counsel:] Ronnie, you haven't filed your taxes, have you?

[Burke:] No, we haven't.

[Plaintiff's Counsel:] We don't have your taxes for last year yet. But my point is, Ronnie, I wanted to ask you, since you were the breadwinner for your family, how has this affected it?

[Burke:] It's affected everything. We had to—we had to pull my daughter out of college. She was in the sorority and drill team and all of this stuff. We had to pull her out of college. We almost lost our home. We have been paying it for 20 years, we almost lost it. I had to borrow money from my sister, from my mother. Nancy borrowed some money from her mother. We got behind on all of our bills. All of it. It just—it changed everything.

Burke's testimony is not inconsistent with the receipt of insurance benefits because the testimony was limited to the financial hardship suffered as a result of his reduced earning capacity, not his medical expenses. *See Snyder*, 191 S.W.3d at 423 (holding that plaintiff's wife's testimony that she did not have money to pay for her husband's surgeries did not open door

to collateral source testimony because large portion of plaintiff's future medical expenses would not be covered by insurance); *Macias,* 917 S.W.2d at 374 (holding that testimony that plaintiff did not receive paychecks was not inconsistent with receipt of insurance benefits and did not open the door to collateral source evidence); *Mundy,* 783 S.W.2d at 745 (holding that trial court did not abuse its discretion in allowing collateral source testimony when plaintiff testified generally about financial hardship caused by injury). The trial court therefore did not abuse its discretion in excluding the evidence that Burke received compensation for his injury from collateral sources.

### Supersedeas Bond

After the jury verdict in favor of Burke, the trial court entered a judgment against LMC in the amount of $155,000 plus interest. The trial court denied LMC's motion to waive or decrease the security required to suspend enforcement of the judgment on appeal. LMC then moved in this court to waive or decrease the security. Initially, we denied the motion because LMC failed to provide a sufficient record upon which to review the trial court's decision. *See LMC Complete Auto., Inc. v. Burke,* No. 01–06–00694–CV, 2006 WL 2506732, at *1, —— S.W.3d ——, at —— (Tex.App.-Houston [1st Dist.] Aug. 31, 2006, order). Burke served LMC with a writ of execution on October 11, 2006. The next day, LMC filed a motion in this court to stay the execution of the writ, and another motion to waive or decrease the security. We granted the stay and remanded the motion to the trial court for the taking of evidence and the entry of findings of fact. *See* Tex.R.App. P. 24.4(d). After a hearing, the trial court entered its findings of fact. LMC has now moved again in this court to waive or decrease the security required to suspend enforcement of the judgment, and

contends the evidence is insufficient to support the trial court's findings of fact.

On remand, the trial court heard evidence from several witnesses. John Compton, an underwriter for surety bonds, testified that his bonding agency examined LMC's financial statements and refused to issue a supersedeas bond because LMC has a negative net worth. LMC's balance sheet for September 2006—submitted to Compton's bonding agency and admitted at the security hearing—shows that LMC has a negative net worth of $5,321.96. Compton testified that he would issue a bond for a company like LMC only if it could supply cash collateral for 100 percent of the bond. Compton did not believe that any other bonding agency would issue a supersedeas bond for LMC. Higdon Compton, the President of the bonding agency, executed an affidavit in which he also stated that he denied LMC's application for a supersedeas bond because LMC's financial condition could not justify the issuance of a bond, based on LMC's profit and loss statement and balance sheet.

Burke submitted LMC's tax returns for 2003 and 2004. In 2003, LMC had total sales of $2,683,637 and a taxable income of negative $69,857. In 2004, LMC had total sales of $2,815,865 and a taxable income of negative $8,680.

Candice Lutz, LMC's office manager, testified that at the time of the hearing, LMC had about $4,800 in the bank. Lutz testified that LMC often has to wait to pay bills because of a lack of cash on hand, and requiring LMC to produce $190,000 for a supersedeas bond would create a substantial economic hardship for the company. Lutz testified that writing even a $5,000 check would create a substantial economic hardship for LMC. LMC barely has enough money to write its payroll checks each week and Lutz and the other

managers will often refrain from cashing their checks immediately to make sure the employees are paid. LMC, however, has never been unable to meet its payroll obligations and has never had to borrow money to pay bills or the payroll.

David Christian, the President of LMC and owner of seventy percent of its stock, testified that requiring LMC to produce $190,000 for a supersedeas bond would put the company out of business, and that even having to write a check for $5,000 would cause a substantial economic hardship. Christian testified that LMC submitted a profit and loss statement and a balance sheet to Compton's bonding agency in an attempt to secure a supersedeas bond, but the agency denied the application. Christian also tried to obtain a letter of credit from a bank but this application was denied as well. LMC is marginally profitable like most body shops, and Christian has never received a bonus from LMC. LMC has considered bankruptcy because Christian does not believe the company will be able to pay the judgment. Christian owns the land on which LMC is located and LMC pays Christian $5,500 a month in rent. Christian also owns a business called LMC Marine that recently constructed a new building. LMC Marine obtained a loan from GE Credit to construct the building.

### A. Standard of Review

[A] judgment debtor may supersede the judgment by: (1) filing with the trial court clerk a written agreement with the judgment creditor for suspending enforcement of the judgment; (2) filing with the trial court clerk a good and sufficient bond; (3) making a deposit with the trial court clerk in lieu of a bond; or (4) providing alternate security ordered by the court.

Tex.R.App. P. 24.1(a). When a judgment is for money, the amount of the bond, deposit, or security must equal the sum of: (1) the amount of compensatory damages awarded in the judgment; (2) interest for the estimated duration of the appeal; and (3) costs awarded in the judgment. See Tex. Civ. Prac. Rem.Code Ann. 52.006(a) (Vernon Supp.2006); Tex.R.App. P. 24.2(a)(1). The amount of the security may not, however, exceed the lesser of (1) fifty percent of the judgment debtor's net worth, or (2) twenty-five million dollars. See Tex. Civ. Prac. Rem.Code Ann. 52.006(b); Tex.R.App. P. 24.2(a)(1).

A judgment debtor who provides security based on the debtor's net worth must simultaneously file an affidavit that states the debtor's net worth and states complete, detailed information concerning the debtor's assets and liabilities from which net worth can be ascertained. Tex. R.App. P. 24.2(c)(1). "The affidavit is prima facie evidence of the debtor's net worth." Id. A judgment creditor may file a contest to the debtor's affidavit of net worth, and may conduct reasonable discovery concerning the judgment debtor's net worth. Tex.R.App. P. 24.2(c)(2). "When a judgment creditor files a contest to the judgment debtor's affidavit of net worth, the trial court must hold a hearing and 'issue an order that states the debtor's net worth and states with particularity the factual basis for that determination.'" In re Smith, 192 S.W.3d 564, 568 (Tex.2006) (orig.proceeding) (quoting Tex.R.App. P. 24.2(c)(3)). "Net worth is calculated as the difference between total assets and total liabilities as determined by generally accepted accounting principles." G.M. Houser, Inc. v. Rodgers, 204 S.W.3d 836, 840 (Tex.App.-Dallas 2006, no pet.); accord Ramco Oil Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C., 171 S.W.3d 905, 915 (Tex. App.-Houston [14th Dist.] 2005, no pet.).

On the motion of a party, an appellate court may review the sufficiency or excessiveness of the amount of security. *See* TEX. CIV. PRAC. REM.CODE ANN. 52.006(d); TEX.R.APP. P. 24.4(a). "Review may be based both on conditions as they existed at the time the trial court signed an order, and on changes in those conditions afterward." TEX.R.APP. P. 24.4(b). We review the trial court's determination of the amount of security under an abuse of discretion standard. *See Isern v. Ninth Court of Appeals,* 925 S.W.2d 604, 606 (Tex.1996) (orig.proceeding); *Rodgers,* 204 S.W.3d at 840; *Ramco Oil Gas, Ltd.,* 171 S.W.3d at 909. The trial court abuses its discretion if the evidence is legally or factually insufficient to support its findings. *See Smith,* 192 S.W.3d at 570; *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998); *Rodgers,* 204 S.W.3d at 840; *Ramco Oil Gas, Ltd.,* 171 S.W.3d at 910. If we conclude the trial court abused its discretion, we may order the amount of the security decreased or increased in an amount not to exceed the lesser of fifty percent of the judgment debtor's net worth, or twenty-five million dollars. *See* TEX. CIV. PRAC. REM.CODE ANN. 52.006(d); TEX.R.APP. P. 24.4(a); *Rodgers,* 204 S.W.3d at 840.

The judgment debtor has the burden of proving net worth. *See* TEX. CIV. PRAC. REM.CODE ANN. 52.006(c); TEX.R.APP. P. 24.2(c)(3). Therefore, to show the trial court abused its discretion based on the legally insufficient evidence, the judgment debtor must show the evidence conclusively establishes, as a matter of law, all vital facts in support of its position. *See Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001); *Rodgers,* 204 S.W.3d at 840–41; *Ramco Oil Gas, Ltd.,* 171 S.W.3d at 910. Testimony from interested witnesses may establish a fact as a matter of law only if the testimony could be readily contradicted if untrue, and is clear, direct, and positive, and there are no circumstances tending to discredit or impeach it. *Lofton v. Tex. Brine Corp.,* 777 S.W.2d 384, 386 (Tex.1989); *see also City of Keller,* 168 S.W.3d at 820 (stating that fact-finder cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted).

**B. Trial Court's Findings of Fact**

The trial court stated its findings of fact as follows:

1. [LMC] is a financially viable, ongoing business with numerous employees, generating annual revenue of over $2.5 million dollars.

2. [LMC] has not proved by a preponderance of the evidence that it is insolvent.

3. [LMC] has not proved insufficient net worth to post a bond, or obtain a bond in due course of business, or able to provide sufficient assets as security to obtain a supersedeas bond.

4. Net worth is found to be in excess of $290,000, with further value undetermined for the reasons set out in these findings.

a. [LMC] has not provided sufficient evidence for the Court to accurately state net worth.

b. The financial affairs of [LMC] are solely controlled by the stockowner and decision maker for [LMC].

c. Testimony and the unaudited financial information presented demonstrate non-arms-length transactions between [LMC], the stockowner, and other related entities.

d. The cash flow of [LMC] is under the control of the stockowner and decision maker.

e. Consolidated financials for the interrelated companies are not available to the Court to evaluate the financial impact of the inter-company and stockowner dealings to prepare financials and calculate net worth.

f. Due to the lack of credible value of the inter-company and stockowner transactions, the Court is unable to determine the reasonable value of the liabilities of [LMC], which, if adjusted, would increase the net worth of [LMC].

g. The affidavit filed fails to state complete, detailed information concerning [LMC's] assets and liability from which net worth can be ascertained.

5. [LMC] has not proved that it is financially unable to post a bond or obtain a bond in due course of business or to provide sufficient assets as security to obtain a supersedeas bond.

6. [LMC] is financially able to post a bond, or obtain a bond in due course of business, or able to provide sufficient assets as security to obtain a supersedeas bond.

7. In addition, the Court adopts the findings of fact attached as Exhibit A.

Exhibit A provides:

1. [LMC] is a business that in tax year 2003 had $2,691,272.00 in gross receipts or sales. [LMC] is a business that in tax year 2004 had $2,815,865.00 in gross receipts or sales. Having been presented with no contrary evidence, this Court finds that [LMC] is a fiscally solvent company;

2. In addition, [LMC's] balance sheet from September of 2006 shows total assets worth $144,482.88;

3. [LMC's] balance sheets from 2006 show a depreciation of $155,068.00 three weeks after the jury's verdict. The jury's verdict in the trial of this matter was $155,000.00. This depreciation is not present on any financial documents prior to the verdict in this matter. The sudden appearance of the depreciation has never been explained by testimony or by any of the documents presented to this Court. The Court finds that this is a write off from the assets and is not a physical loss or expenditure. The Court further finds that this is available money for the payment of a bond.

4. According to its own balance sheets, [LMC] has business accounts and lines of credit with Capital One, Amegy Bank, HCB, MBNA Commercial, Klein Bank, Houston Community Bank, Paradigm Bank and Prosperity Bank. There was no testimony or evidence presented that any of these lending institutions were contacted or consulted for the purpose of obtaining financing for payment of a supersedeas bond. The Court finds that these institutions add to the available assets and net worth of [LMC].

5. Mr. Christian testified that he owns the property and the building on which [LMC] is located and that he receives monthly rentals for the land and building from [LMC]—a company that he owns 70% of. Mr. Christian is also the sole owner of another business, LMC Marine, which since the verdict in this matter has begun construction of a brand new facility on Interstate 45 north. Mr. Christian testified that the business [of LMC] was part of the basis of the construction/property loan for the new LMC Marine facility. Based on this, the Court finds that [LMC] has value as a company.

6. Mr. Christian failed to present any evidence or testimony that he, as both the owner and landlord of [LMC] has ever been unable to acquire funding for [LMC].

7. Ms. Lutz, the office manager for [LMC] testified that there are currently nineteen (19) employees at [LMC] and that they are paid each week. Ms. Lutz testified that [LMC] was able to meet their weekly payroll obligations which she estimated to be approximately $15,000.00 per week and that no employees had been laid off. Based on this testimony, the Court finds that there is no factual basis supporting any claim of financial hardship;

8. Mr. Compton, the son of Mr. Higdon Compton, a bondsman, testified that his company would not extend a bond to [LMC] but testified that the decision was based on the financial documents that [LMC] itself provided. Mr. Compton also testified that his company has done a large amount of business in the past with [the] law firm representing [LMC]. Mr. Compton did not receive or review any documentation that would support the financial data that [LMC] provided. Mr. Compton signed an affidavit on October 11, 2006 setting forth his conclusion that neither his company, nor any other company, would issue the requisite bond. However, the facsimile transfer indication on the bottom of Mr. Compton's affidavit indicates that he had signed and transferred the affidavit back to counsel for [LMC] at approximately 4:11 p.m. on October 11, 2006. According to the writ of execution served on October 11, 2006, the Harris County Constable's Office served the writ at 11:48 p.m. (actually "a.m."). This means that the financial documentation was printed off, sent to Mr. Compton's firm, reviewed, compared the reaction of every other company in the Harris County & Montgomery County areas, and rejected the bond. Then, an affidavit was written, sent to Mr. Compton, signed by Mr. Compton, and faxed back to counsel for [LMC's] office within a maximum

time period of four hours and twenty-three minutes. The Court finds that this is not a sufficient time to conduct a proper valuation of the business for the purposes of establishing net worth; although it was sufficient for Mr. Compton to determine the documentation did not support a bond.

9. Further, Mr. Compton testified that his company did not examine the available assets of [LMC] in reaching their conclusion not to extend a bond.

## C. Net Worth

■ LMC contends the evidence is legally and factually insufficient to support the trial court's finding that LMC has a net worth in excess of $290,000. The only evidence of LMC's net worth admitted at the security hearing was Christian's testimony, and LMC's balance sheet from September 2006 that shows that LMC has a net worth of negative $5,321.96. LMC had previously admitted balance sheets from 2002, 2003, 2004, and April of 2006 that show a net worth of negative $6,291.11, negative $2,399.68, positive $45,482.73, and negative $7,206.84, respectively.

LMC's balance sheet from September 2006 constitutes evidence that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted. *See Lofton*, 777 S.W.2d at 386; *see also City of Keller*, 168 S.W.3d at 820; *Rodgers*, 204 S.W.3d at 845–46; *Ramco Oil & Gas, Ltd.*, 171 S.W.3d at 911–12. Although Burke contends that the balance sheet is not credible, he produced no evidence to discredit the balance sheet or controvert the amounts it contains (with the exception of a depreciation allowance discussed below). While LMC's tax returns demonstrate that it had sales revenues in excess of $2,000,000 in 2003 and 2004, LMC sustained a net loss in each of these years.

The tax returns do not state LMC's net worth. We hold that the September 2006 balance sheet was sufficient to prove LMC's net worth as required by Texas Rule of Appellate Procedure 24. *See* Tex. R.App. P. 24.2(c)(1).

■ The trial court, however, expressly found that the "depreciation" entry of $155,068.00 on LMC's balance sheet was not a physical loss or expenditure, and constituted an amount that LMC could use to obtain a supersedeas bond. The depreciation entry first appeared on the April 2006 balance sheet, which LMC presented to the trial court three weeks after the verdict in this case. The depreciation entry lowers the value of LMC's assets from $299,540.88 to $144,482.88. LMC's total liabilities, uncontested at the hearing, are $149,804.84. With the depreciation entry, LMC's net worth is negative $5,321.96; without the depreciation entry, LMC's net worth is $149,736.04.

We hold that the evidence supports the trial court's finding that the depreciation allowance on LMC's balance sheet was not an entry made in the ordinary course of business so as to reduce LMC's net worth, but rather was inserted in an effort to reduce LMC's asset valuation after the verdict, and thus does not reduce the available assets that LMC could use to obtain a supersedeas bond. LMC never explained the appearance of the depreciation entry, and LMC included the entry for the first time on its April 2006 balance sheet, which LMC presented to the trial court three weeks after the verdict in this case.

Although the trial court also found that LMC engaged in transactions with its majority shareholder, there is no evidence that these transactions were outside the ordinary course of business or that any took place after the verdict in order to deplete LMC's net worth. We therefore conclude that the evidence is insufficient to support the trial court's determination that LMC has a net worth in excess of $290,000. Additionally, the trial court failed to state a specific net worth figure or state with particularity how it reached a figure in excess of $290,000. *See Smith,* 192 S.W.3d at 570 ("The trial court abused its discretion here because it failed to state with particularity the factual basis for its determination that Smith's net worth was $1,142,951."); *Rodgers,* 204 S.W.3d at 846.

After reviewing the record as a whole, we conclude that the evidence presented establishes LMC's net worth sufficiently for us to reset the bond, as we are required to do in Texas Rule of Appellate Procedure 24. Tex.R.App. P. 24.4(d); *see also Rodgers,* 204 S.W.3d at 846. Because the evidence is sufficient to support the trial court's determination that the depreciation allowance actually constitutes available assets that LMC could use to obtain a supersedeas bond, we eliminate this entry from consideration. According to the balance sheet, LMC has assets worth $299,540.88, and liabilities totaling $149,804.84. Subtracting liabilities from assets, LMC's net worth is $149,736.04. *See* Tex. Civ. Prac. Rem.Code Ann. 52.006(c); Tex.R.App. P. 24.2(c)(3); *Rodgers,* 204 S.W.3d at 846; *Ramco Oil Gas, Ltd.,* 171 S.W.3d at 911–12. Applying Texas Rule of Appellate Procedure 24.2(a)(1)(A), security for supersedeas for LMC should be set at $74,868.02, fifty percent of LMC's net worth. *See* Tex. R.App. P. 24.2(a)(1)(A), 24.4(d).

### D. Substantial Economic Harm

LMC contends the evidence is legally and factually insufficient to support the trial court's finding that the security required to suspend enforcement of the judgment was not likely to cause LMC substantial economic harm.

A trial court must lower the amount of security required to suspend enforcement of a judgment to an amount that will not cause the judgment debtor substantial economic harm if, after notice to all parties and a hearing, the court finds that the security required is likely to cause the judgment debtor substantial harm. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 52.006(c); TEX.R.APP. P. 24.2(b). The rule and the statute do not define the term "substantial economic harm," but it is clear that it is something less than "irreparable harm," the legal standard utilized under the previous version of the statute. *Ramco Oil Gas, Ltd.*, 171 S.W.3d at 916. "The thrust of the inquiry under section 52.006(c) [and Rule 24.2(b)] is whether the judgment debtor has the ability to meet the supersedeas requirement[,] ... and whether doing so is likely to result in substantial economic harm." *Id.* at 917. In *Ramco Oil Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.*, the Fourteenth Court of Appeals stated:

> In conducting [an economic harm] analysis, the trial court has the flexibility to take into account a number of factors that could affect the judgment debtor's ability to post bond or other security based on the facts and circumstances specific to the case. This inquiry, however, should not focus on the market capitalization of the company or its value as a whole but on the judgment debtor's actual ability to post the security required. In other words, the court should be less concerned with what price the company might fetch in the marketplace if sold today and more concerned with the company's available resources and its ability to use them to post security.

*Id.*

The trial court found that posting a supersedeas bond for the full amount of the judgment would not be likely to cause substantial economic harm to LMC. We therefore presume that the trial court also found that posting a bond in the amount of $74,868.02, fifty percent of LMC's actual net worth, would not be likely to cause substantial economic harm to LMC. *See* TEX.R.APP. P. 24.2(a)(1)(A); *Ramco Oil Gas, Ltd.*, 171 S.W.3d at 917 ("The trial court found that posting a supersedeas bond in the amount of $7.505 million will not cause substantial economic harm to Ramco Energy. We presume that the trial court also found that posting a bond, deposit, or security in the amount of $5.27 million will not likely cause substantial economic harm to Ramco Energy.").

Both Christian and Lutz testified at the security hearing that requiring LMC to post even a $5,000 supersedeas bond would cause the company substantial economic harm. The only testimony LMC produced concerning its ability to obtain a supersedeas bond came from Higdon and Compton, who admittedly had only reviewed LMC's balance sheet and profit and loss statement in making their decision not to extend a supersedeas bond to LMC. As the trial court found, LMC only applied for a supersedeas bond at one bonding agency, and the agency made its decision to deny LMC's application for a bond in about four hours. LMC's balance sheet demonstrates that its assets include $50,673.82 in cash and accounts receivable, which according to Compton is an important factor in determining whether his bonding agency will issue a supersedeas bond. While both Christian and Lutz testified that LMC has difficulty paying its bills, the record contains no evidence that LMC would be unable to meet its future financial obligations. While this testimony was uncontroverted, we hold that the trial court was free to reject these opinions in light of other evidence, including LMC's

past revenues and its ability to otherwise secure funding for its operations. LMC has not shown substantial economic harm so as to conclude that the trial court abused its discretion. *See Lofton,* 777 S.W.2d at 386 (stating that testimony from interested witnesses may establish fact as matter of law only if testimony could be readily contradicted if untrue, and is clear, direct, and positive, and there are no circumstances tending to discredit or impeach it); *see also City of Keller,* 168 S.W.3d at 820.

In light of these considerations, we conclude that the testimony of interested witnesses Christian and Lutz does not satisfy the *Lofton* standard and fails to prove as a matter of law that LMC will likely suffer substantial economic harm if required to post a supersedeas bond in the amount of $74,868.02. *See* 777 S.W.2d at 386; *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 52.006(c); TEX.R.APP. P. 24.2(b). Under the applicable standard of review, the record contains legally and factually sufficient evidence to support the trial court's finding that LMC is not likely to suffer substantial economic harm if required to post $74,868.02 in security. *See Ramco Oil Gas, Ltd.,* 171 S.W.3d at 920. The trial court therefore did not abuse its discretion in impliedly making this determination.

### E. Conclusion

The record does not support the trial court's finding that LMC has a net worth in excess of $290,000. The evidence, however, establishes that LMC has a net worth of $149,736.04. In addition, the trial court did not abuse its discretion in impliedly concluding that LMC is not likely to suffer substantial economic harm if required to post $74,868.02 in security. We vacate the trial court's July 25, 2006 order denying LMC's motion to decrease the security required to suspend enforcement of the judgment. Pursuant to Texas Rule of Appellate Procedure 24, we order that the security for supersedeas for LMC be set at $74,868.02, fifty percent of LMC's net worth. *See* TEX.R.APP. P. 24.2(a)(1)(A), 24.4(d). Our order entered on February 15, 2007, staying the enforcement of the judgment in this case, will remain in effect for fifteen days after the date this opinion issues to allow the parties to seek further review of our security determination.

### LMC's Separate Appeal of the Trial Court's Findings of Fact

 LMC filed a separate appeal challenging the trial court's findings of fact on the security issue (cause number 01–07–00126–CV). The general rule is that an appeal may be taken only from a final judgment. *Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 195 (Tex.2000). This rule has exceptions, but none is applicable here. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 15.003 (Vernon Supp.2006), § 51.012 (Vernon 2003), § 51.014 (Vernon Supp. 2006). LMC cannot appeal the trial court's findings of fact because the findings do not constitute a final judgment. *See Lehmann,* 39 S.W.3d at 195 ("A judgment is final for purposes of appeal if it disposes of all pending parties and claims in the record, except as necessary to carry out the decree."). Rather, LMC's remedy is to challenge the bond by seeking relief from the court of appeals in the cause in which the appeal is pending pursuant to Texas Rule of Appellate Procedure 24. TEX.R.APP. P. 24.4(a). We therefore dismiss appellate cause number 01–07–00126–CV for want of jurisdiction. *See New York Underwriters Ins. Co. v. Sanchez,* 799 S.W.2d 677, 679 (Tex.1990) (holding that appellate court's assumption of jurisdiction over interlocutory order when not expressly authorized to do so by statute is fundamental jurisdictional error).

**Conclusion**

We hold that the evidence is legally sufficient and sufficiently reliable to support the jury's negligence finding, and the trial court did not abuse its discretion in excluding the evidence that Burke received compensation for his injury from collateral sources. We therefore affirm the trial court's judgment. We further hold that the record demonstrates that LMC has a net worth of $149,736.04. We therefore vacate the trial court's July 25, 2006 order denying LMC's motion to decrease the security required to suspend enforcement of the judgment, and order that the security for supersedeas for LMC be set at $74,868.02, fifty percent of LMC's net worth. Our order entered on February 15, 2007, staying the enforcement of the judgment in this case, will remain in effect for fifteen days after the date this opinion is issued to allow the parties to seek further review of our security determination. We dismiss appellate cause number 01–07–00126–CV for want of jurisdiction.