Opinion issued February 21, 2008 



 










 

In The

Court of Appeals

For The

First District of Texas






NO. 01-04-01111-CV

 __________


ENVIROPOWER, L.L.C., Appellant


V.


BEAR, STEARNS & CO., INC., Appellee






On Appeal from the 164th District Court

Harris County, Texas

Trial Court Cause No. 2004-37741






DISSENTING FROM OPINION ON EN BANC ORDER (1)

 In this action to enforce a New York judgment, EnviroPower, L.L.C. complains
of the trial court's orders denying its motion for new trial, motion to vacate, and
motion to stay enforcement of the judgment. I respectfully dissent from the en banc
majority's conclusion that the trial court erred in finding that EnviroPower had a
positive net worth and setting the bond amount at $200,000. 

 The parties do not dispute the definition of "net worth" for purposes of
calculating the amount of a supersedeas bond: Net worth is generally measured as
assets minus liabilities. Rather, the key issue in dispute here is what value should the
trial court have placed on EnviroPower's assets, which are used to calculate net
worth. Specifically, the issue is whether the trial court was required to accept the
historic cost or book value of EnviroPower's permits as the value to be used in
calculating net worth or whether it could consider evidence of the fair market value
of these permits. I believe that the trial court did not abuse its discretion in
considering evidence regarding the fair market value of the permits in finding that
EnviroPower has a positive net worth and in setting the bond amount. Accordingly, 
I would affirm. 

Background


 Bear, Stearns & Co., Inc. sued EnviroPower in New York state court for breach
of contract and quantum meruit alleging that EnviroPower failed to pay Bear, Stearns
for services performed and expenses incurred. The New York court, sua sponte,
found that, during discovery, EnviroPower intentionally withheld documents, and it
struck EnviroPower's answer. After an evidentiary hearing, the New York court
entered a total judgment for Bear, Stearns in the amount of $1,309,880, which
included the appropriate interest, costs, and disbursements. 

 Bear, Stearns domesticated its foreign judgment in the 164th District Court of
Harris County, Texas. See Tex. Civ. Prac. & Rem. Code Ann. §§ 35.003, 35.004,
35.005 (Vernon 1997). EnviroPower filed a Motion to Vacate Foreign Judgment,
Motion for New Trial, and Motion to Stay Enforcement of Judgment in Response to
"Judgment Creditor's Action for Enforcement of Foreign Judgment." After an
evidentiary hearing and additional briefing regarding the definition of "net worth,"
the trial court denied the motions and ordered EnviroPower to provide Bear, Stearns
security in the amount of $200,000 in connection with the underlying New York
judgment.

Bond Amount


 EnviroPower argues that the trial court erred in refusing to stay enforcement
of the New York judgment (2) and in setting the bond amount at $200,000. Specifically,
EnviroPower contends that it was entitled to a stay without being required to file a
supersedeas bond.

 After an evidentiary hearing, the trial court denied EnviroPower's motion to
vacate foreign judgment, motion for new trial, and motion to stay enforcement of
judgment and made the following findings:

 (1) The underlying New York judgment is entitled to full faith and
credit.


 (2) EnviroPower, LLC ("Judgment Debtor") has timely filed a notice
of appeal from the New York judgment.


 (3) Net Worth has not been defined in the supersedeas bond statute.


 (4) One definition of Net Worth is assets minus liabilities.


 (5) Market Value means the amount that would be paid in cash by a
willing buyer who desires to buy, but is not required to buy, to a
willing seller who desires to sell, but is under no necessity of
selling.


 (6) The evidence adduced at the hearing does not reflect the fair
value of the primary assets of the Judgment Debtor, which are the
federal air permits.


 (7) Judgment Debtor's assets minus liabilities is negative
$12,000,000.00.


 (8) A buyer stands willing to purchase Judgment Debtor for
$10,000,000.00.


 (9) The evidence adduced at the hearing establishes that business
valuation experts do not rely exclusively on assets minus
liabilities in determining the value of businesses.


 (10) Judgment Debtor's current net worth for purposes of setting a
supersedeas bond is $8,000,000.00.


 (11) Judgment Debtor is likely to suffer substantial economic harm if
required to post security in the full amount required by the
supersedeas statute.


 (12) The Court determines that a supersedeas bond in the amount of
$200,000.00 will not cause Judgment Debtor substantial
economic harm. 


(Emphasis added.)


Standard of Review

 We review the trial court's rulings concerning the amount and type of bond
required and the sufficiency of the sureties under an abuse of discretion standard. 
Tex. R. App. P. 24.4; see also Miller v. Kennedy & Minshew, Prof'l Corp., 80 S.W.3d
161, 165 (Tex. App.--Fort Worth 2002, no pet.). The test for whether a trial court
abused its discretion is whether the trial court acted arbitrarily or unreasonably in
light of all the circumstances of the case. McDaniel v. Yarbrough, 898 S.W.2d 251,
253 (Tex. 1995); Lewis v. Western Waste Indus., 950 S.W.2d 407, 410 (Tex.
App.--Houston [1st Dist] 1997, no writ). 

Setting of Supersedeas Bond

 A judgment debtor may show a ground on which the enforcement of the
judgment would be stayed, and the court may require the same security for
suspending the enforcement that is required in accordance with section 52.006 of the
Texas Civil Practice and Remedies Code. Tex. Civ. Prac. & Rem. Code Ann. §
35.006(b) (Vernon Supp. 2007). Section 52.006 articulates the requirements for
setting the amount of a supersedeas bond for a foreign judgment as follows: 

 (b) Notwithstanding any other law or rule of court,
when a judgment is for money, the amount of
security must not exceed the lesser of:


 (1) 50 percent of the judgment debtor's net
worth; or


 (2) $25 million.


 (c) On a showing by the judgment debtor that the
judgment debtor is likely to suffer substantial
economic harm if required to post security in an
amount required under Subsection (a) or (b), the trial
court shall lower the amount of the security to an
amount that will not cause the judgment debtor
substantial economic harm.

 

Id. § 52.006(b), (c) (Vernon Supp. 2007) (emphasis added). The Texas Rules of
Appellate Procedure, applicable to the security required for appeals, also addresses
the security calculation, but with a slight variation. Rule 24.2(a) states that the
amount of a security bond cannot exceed 50 percent of the judgment debtor's current
net worth or $25 million. Tex. R. App. P. 24.2(a)(1). 

 Neither statute defines "net worth," and EnviroPower argues that we should
look to the appellate review guidelines in Rule 24.4 for guidance in interpreting the
"net worth" language of section 52.006. Tex. R. App. P. 24.4 (appellate court cannot
modify security amount to exceed Rule 24.2(a)(1)). EnviroPower contends that,
although section 52.006 does not contain the clause "current net worth," the phrase
is necessarily inherent in the code provision because, for bond purposes, a judgment
debtor's net worth at any other time than "currently" is irrelevant. Thus, EnviroPower
asserts that its "future" sale for $10 million does not support the trial court's finding
that the company's net worth is $8 million. EnviroPower argues that its net worth is
negative $12 million, and as a consequence, under section 52.006(b) and Rule 24.2, 
it was not required to post security in any amount. I disagree.

 In this case, the trial court found that the evidence produced by EnviroPower
regarding its net worth undervalued its primary assets, its federal air permits, on its
balance sheet. Thus, the trial court did not err in considering evidence regarding
EnviroPower's pending sale to determine the value of these primary assets and to
calculate its net worth. The trial court heard testimony from two witnesses regarding
the issue of EnviroPower's net worth. Deborah Dawson, EnviroPower's chief
financial officer, testified that EnviroPower was formed for the purpose of identifying
plant locations that were feasible to build power plants, and it has obtained air permits
in Kentucky and Illinois. In her deposition testimony, Dawson explained that these
air permits take between two to seven years to obtain if a company can obtain them
at all. Also in the record is evidence that these air permits are the most valuable
assets that EnviroPower owns. The record reflects that, without the permits, no
power plants can be built.

 Dawson also presented a document entitled EnviroPower's "Management
Report 2003" that contained EnviroPower's balance sheet as of December 31, 2003. (3)

Using this document, Dawson explained that, on an accrual basis under generally
accepted accounting principles ("GAAP"), EnviroPower's net worth is negative
$12,000,000. Nevertheless, she also testified that, initially, she placed the value of
EnviroPower between $20 and $40 million. More recently, she represented to
potential investors that the company was worth $10 million. Finally, Dawson 
testified that there was a pending contract for the sale of EnviroPower to Khanjee. 
She testified that, pursuant to this contract, Khanjee is to pay $10 million for
EnviroPower in addition to another $8 million to El Paso as "a return of their lending
to us." (4) 

 Nick D'Ambrosio, a senior manager of an international accounting firm,
testified that, in addition to holding a CPA license and a juris doctor degree, he is also
a certified valuation analyst, which relates to the valuation of businesses. 
D'Ambrosio testified that the difference between his calculation of net worth and 
Dawson's calculation based on EnviroPower's balance sheet was that he applied the
fair market values rather than historic costs or book values to determine
EnviroPower's assets. D'Ambrosio testified that, to determine current net worth,
EnviroPower's assets should be valued at their current fair market value, not their
historic costs. 

 D'Ambrosio explained that the permits were more valuable than Dawson's
balance sheet suggests. D'Ambrosio testified that the fact that and amount for which
companies were willing to spend money to preserve the permits by purchasing 
EnviroPower, despite its liabilities, is evidence of the fair market value of the permits. 
 He testified that this information should be used in calculating EnviroPower's net
worth:

 Q --What, in your--having looked at all the documents that you've
looked at in this case, Nick, what is the net worth of EnviroPower, in
your opinion?


 . . . 


 A --As an appraiser, what I--I looked at is the--the market transactions
that were testified to by Ms. Dawson, and, clearly, they're a series of
valuations where they're negotiating transactions, whether it's with
Kinder Morgan, Primary Energy, Apogee, or Khanjee, that indicate that
there is some value to these air permits in--in excess of--or around $10
million of future value. 


 Clearly, that--that would lead me to believe that there can't be no value
to this firm. You have companies that are willing to put up money. El
Paso continually puts out money. If these had no value, there'd be no
reason for someone to continue to expend money to try to preserve this
asset. 


 So in my view, there is net worth here, and trying to quantify that is
difficult, but the best indication that we have is the exchange that
Khanjee was willing to negotiate and--and execute with EnviroPower
which puts the value at about $10 million.


(Emphasis added.) After finding that the definition of "net worth" is assets minus
liabilities, the trial court used the evidence presented by D'Ambrosio to determine the
value of its assets. See Tex. Civ. Prac. & Rem. Code Ann. § 52.006(b). The trial
court recognized that the evidence produced by EnviroPower stated that its assets
minus liabilities totaled a negative $12 million. However, the court also found that
this evidence did not accurately reflect the fair value of EnviroPower's primary
assets, which are federal air permits. (5) Considering, among other things, evidence
surrounding the pending sale of EnviroPower, (6) including the amounts to be
reimbursed to various entities as part of this sale and D'Ambrosio's testimony, the
trial court ruled that EnviroPower's net worth is $8 million. However, acting within
its discretion, the trial court ruled that, if required to provide security for the full
amount of the New York judgment, EnviroPower would suffer substantial economic
harm. The court therefore lowered the security amount to $200,000. 

 We must review the trial court's interpretation of the applicable statutes de
novo. See Bragg v. Edwards Aquifer Auth., 71 S.W.3d 729, 734 (Tex. 2002). The
overriding objective of statutory construction is to determine and give effect to the
Legislature's intent. See Cont'l Cas. Co. v. Downs, 81 S.W.3d 803, 805 (Tex. 2002). 
In order to ascertain legislative intent, we must first look to the plain and common
meaning of the words used by the Legislature. Tex. Gov't Code Ann. § 311.011
(Vernon 1998 & Supp. 2007); St. Luke's Episcopal Hosp. v. Agbor, 952 S.W.2d 503,
505 (Tex. 1997). 

 "Net worth" is generally defined as the excess of total assets over total
liabilities. See, e.g., Black's Law Dictionary 1639 (8th ed.2004); Webster's
Third New International Dictionary 1519 (1993 ed.); Investopedia (2000 ed.). 
Many courts have also accepted this definition. For example, in holding that the
unambiguous meaning of the term "net worth" in section 52.006 means the difference
between total assets and total liabilities, the Fourteenth Court of Appeals made the
following observation: 

 The Legislature could have required the trial court to determine the
Security Amount based on 50 percent of a judgment debtor's value,
using whatever measure of value the trial court found to be most
appropriate. However, the Legislature did not do so; instead, it required
that the trial court base this determination on the judgment debtor's "net
worth." 


Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C., 171 S.W.3d 905, 915 (Tex.
App.--Houston [14th Dist.] 2005, no pet.). Similarly, the United States Court of
Appeals for the Seventh Circuit held that the plain meaning of "net worth," in
accordance with GAAP, is the difference between total assets and total liabilities. 
Continental Web Press, Inc. v. NLRB, 767 F.2d 321, 323 (7th Cir. 1985), disapproved
of on other grounds by Comm'r. v. Jean, 496 U.S. 154, 160-66, 110 S. Ct. 2316,
2319-23 (1990). The court went on to note that, because the Legislature did not
define the statutory term "net worth," it is fair to assume that, "if it had thought about
the question, it would have wanted the courts to refer to [GAAP]." Id. 

 When, as here, there has been a finding by the trial court that the debtor's
evidence does not state the true value of a company's assets used in calculating "net
worth," the court does not err in looking to the concept of market value to determine
the value of a company's assets. An asset's fair market value is usually the best
evidence of its true value. Zeptner v. Zeptner, 111 S.W.3d 727, 741 (Tex. App.--Fort
Worth 2003, no pet.); Beavers v. Beavers, 675 S.W.2d 296, 299 (Tex. App.--Dallas
1984, no writ). "Fair market value" has consistently been defined as "the price the
property will bring when offered for sale by one who desires to sell, but is not obliged
to sell, and is bought by one who desires to buy, but is under no necessity of buying." 
City of Pearland v. Alexander, 483 S.W.2d 244, 247 (Tex. 1972); Nelson v. Najm,
127 S.W.3d 170, 177 (Tex. App.--Houston [1st Dist.] 2003, pet. denied). 

 Furthermore, the legislative history of section 52.006 reveals that, by not
defining the term "net worth," the Legislature intended to give trial courts the
discretion to weigh all of the evidence and not just a company's accounting records,
in determining the appropriate amount of a supersedeas bond. See House Res. Bill
Org., Bill Analysis, H.B. 4, 78th Leg., R.S., p. 46 (2003) ("There is no easy way
to define 'net worth,' and it is important to give judges discretion to determine this
on a case-by-case basis. If a plaintiff feels that a defendant is manipulating its assets
to reduce the bond amount, the plaintiff can ask the judge to address this."). Thus,
I would hold that, for supersedeas purposes, where the evidence presented by the
debtor does not reflect the fair value of its assets, the court does not err in considering
evidence of the market value of a company's assets to make the net worth calculation
of assets minus liabilities. A company's book value net worth can be manipulated,
making it an unreliable means of determining a company's true net worth. See id.;
Wal-Mart Stores, Inc. v. Alexander, 868 S.W.2d 322, 330-31 (Tex. 1993) (Gonzalez,
J., concurring) (punitive damages). 

 Relying on our recent holding in LMC Complete Automotive, Inc. v. Burke, and
our sister courts' holdings in Ramco and G.M. Houser, EnviroPower argues that the
trial court erred in considering evidence regarding market value and that, in doing so,
the court created a new "market value" test for the calculation of net worth that is not
authorized under either section 52.006 or Rule 24.2(a)(1). See LMC Complete
Automotive, Inc. v. Burke, Nos. 01-06-00694-CV, 01-07-00126-CV, 2007 WL
1793419 (Tex. App.--Houston [1st Dist.] June 21, 2007, n.p.h.); G. M. Houser, Inc.
v. Rodgers, 204 S.W.3d 836 (Tex. App.--Dallas 2006, no pet.); Ramco Oil & Gas,
Ltd., 171 S.W.3d at 915. I would hold that EnviroPower's reliance on these cases is
misplaced. The Burke analysis is applicable to these facts, and the other two cases
are distinct from the case at bar. 

 Burke stands for the proposition that when, as here, there is credible evidence
that a component of net worth, either assets or liabilities, has been incorrectly valued
on the balance sheet, the trial court does not err when it looks to the record as a whole
to determine the true value of the assets or liabilities. In Burke, the trial court
recognized that net worth was measured as assets minus liabilities. The debtor
claimed a negative net worth, and the creditor argued that the value of the liabilities
on the balance sheet was overstated and produced evidence to support its argument. 
The trial court agreed with the creditor and looked at the record as a whole to
determine the true value of the liabilities. It adjusted the value of liabilities to delete
the depreciation expense and recalculated net worth. Similarly, the trial court here
recognized that net worth was measured as assets minus liabilities. The
debtor/EnviroPower claimed a negative net worth. The creditor/Bear, Stearns argues
that an asset on the balance sheet, the air permits, was undervalued, and presented
evidence to support the argument--including evidence of the company's pending sale
for $10 million, the costs that continued to be incurred to keep these permits from
expiring, and the fact that Dawson did not specify a value for the air permits on the
balance sheet. The trial court here, just as in Burke, looked at the record as a whole
to determine the true value of the assets. During this evaluation, the trial court looked
at the evidence presented regarding the market value of EnviroPower. The trial court
adjusted the value of the assets to reflect the true value of the air permits and
recalculated the net worth accordingly.

 In Ramco, where the court rejected looking to any evidence of "market
capitalization" in making the net worth calculation, there was no finding by the trial
court that the debtor had presented evidence that undervalued its assets or misstated

its liabilities. Thus, under those circumstances, there was no justification for the trial
court to consider any information other than the evidence presented by the company's
balance sheets or "book value" to determine the true value of the company's assets. 
That is not the case here. 

 Similarly, in G.M. Houser the court of appeals found that there was no factual
basis for the trial court to conclude that the debtor had fraudulently undervalued or
misstated its assets or to not consider the debtor's evidence of assets and liabilities
as true. In this case, there was a finding, supported by the evidence presented, that
EnviroPower's evidence did not state the fair value of its assets; therefore, the trial
court did not abuse its discretion in looking to evidence of the market value of these
assets to calculate EnviroPower's net worth. Under these circumstances, I would
hold that the trial court was within its discretion in finding EnviroPower's current net
worth to be $8 million. I would further hold that the trial court did not abuse its
discretion in setting the bond amount at $200,000. 

 I respectfully disagree with the conclusion that using fair market value
accounting principles to determine the value of a company's assets would lead to
"confusion and uncertainty among litigants and trial courts in determining bond
amounts" or impose a burden on a litigant's right to pursue an appeal. The fair
market valuation of assets has been a part of GAAP, and thus used by business
litigants, for several decades in standards implemented by the Financial Accounting
Standards Board ("FASB"), including those standards dealing with inventions,
investments, financial instruments of all kinds, business combinations and stock
options. (7) For example, it has long been required for accountants to note impaired
assets to a fair value less than their original cost or book value. Recently, FASB has
enacted additional standards regarding the use of fair valuation principles in
determining the value of assets carried on a company's balance sheet. (8) Several of
these standards specifically require companies to record acquired intangible assets,
which would include government permits, at fair value not historic costs or book
value. (9)

 In this case, the fair market value of EnviroPower's primary asset, the permits, 
is more relevant to the court's decision regarding a company's current ability to
obtain a bond than historic costs, especially where, as here, there is evidence that
using historic costs or book values leads to a vast undervaluation of an asset. See,
e.g., Tex. R. App. P. 24. (requiring court to determine current net worth.). 
Furthermore, if a litigant believes that, under a fair market evaluation of its assets, it
still cannot post a bond, it would not be forced into bankruptcy or asset liquidation
to proceed with its appeal. Texas Rule of Appellate Procedure 24 provides litigants
with alternative means of preventing execution of a judgment pending appeal, without
the need for posting a bond. In this case, however, EnviroPower did not seek any
such alternative relief from the trial court or from this Court on appeal. 

 Finally, the majority cites to a portion of EnviroPower's appellate brief to
support the conclusion that using fair market value accounting principles to determine
net worth would lead to "arbitrariness" in net worth determinations. I respectfully
disagree. EnviroPower's statements in the brief do not reflect all of the facts before
the trial court. For example, EnviroPower states that the permits "are not transferable
or assignable." However, while EnviroPower cannot sell the permits, Dawson and
D'Ambrosio testified that they can be acquired by the company that purchases
EnviroPower. D'Ambrosio testified that, consequently, they have great value. 
EnviroPower's appellate brief also states that the value of the air permits "was not
controverted at the hearing" before the trial court. While Bear, Stearns did not
controvert the book value or historic cost of the permits as they are carried on
EnviroPower's balance sheet, it did challenge and continues to challenge the
conclusion that the book values represent the current value of the air permits.

 For all of the reasons stated above, I would hold that the trial court did not
abuse its discretion in deciding to consider the market value of the permits, rather
than the book value presented by EnviroPower, in calculating EnviroPower's net
worth.

 Conclusion


 Accordingly, I would affirm the trial court's ruling on the bond, and I
respectfully dissent from the En Banc Order and the Opinion on En Banc Order
holding to the contrary. 


 George C. Hanks, Jr.

 Justice

 

Panel consisted of Justices Taft, Keyes, and Hanks.


En banc consideration was requested. Tex. R. App. P. 49.7.


A majority of the justices of the Court voted in favor of reconsidering the case en
banc. See id.


The en banc Court on reconsideration consists of Chief Justice Radack and Justices
Taft, Nuchia, Jennings, Keyes, Alcala, Hanks, Higley, and Bland.


Justice Keyes, writing for the majority of the en banc Court, joined by Chief Justice
Radack and Justices Jennings, Alcala, Higley, and Bland. 


Justice Bland, joined by Justice Jennings, specially concurring with the opinion of the
en banc Court. See id.


Justice Hanks, joined by Justices Taft and Nuchia, dissenting from the order and
opinion of the en banc Court. 

1. See EnviroPower, L.L.C. v. Bear, Stearns & Co., Inc., No. 01-04-01111-CV,
S.W.3d__ (Tex. App.--Houston [1st Dist.] Feb. 21, 2008, no pet. h.) (Order).
2. EnviroPower's complaint regarding the trial court's refusal to grant the stay is
addressed in the opinion issued herewith.
3. Although Dawson testified that part of the sum included under the asset entitled
"Development Costs" represented (1) the value or "intangible cost" to Enviropower
of procuring the air permits and (2)"the value of [El Paso's] right to purchase part of
Enviropower at that point in time," the record is not clear as to what those sums are. 
4. The record is silent as to the specifics of the loan arrangement with El Paso. 
5. EnviroPower does not challenge this fact finding on appeal. 
6. This included evidence regarding EnviroPower's negotiations with at least three other
willing buyers, in addition to Khanjee, all of whom offered to assume EnviroPower's
liabilities and pay a range of from $1 to $10 million for EnviroPower.
7. The following pronouncements all refer to the use of fair value principles: FASB
Statement of Financial Accounting Standard ("SFAS") Nos. 13, 15, 19, 23, 28, 35, 45,
60, 61, 63, 65 through 68, 84, 87, 98, 106, 107, 114, 115, 116, 124, 126, 133, 136,
138, 140, 141, 142, 144, 146, 149, 150, 153, 156; Interpretation Nos. 9, 23, 24, 45;
and Opinion Nos. 18, 21, 28, and 29.
8. See FASB SFAS No. 159, "The Fair Value Option for Financial Assets and Financial
Liability"; SFAS No. 157, "Fair Value Measurements"; and Statement of Financial
Accounting Concept No. 7, "Using Cash Flow and Value in Accounting." 
9. See, e.g., SFAS 141, "Business Combinations"; SFAS 142, "Goodwill and other
Intangible Assets"; and SFAS 144, "Accounting for the Impairment or Disposal of
Long Lived Assets."