**ABILENE INDEPENDENT SCHOOL DISTRICT, Appellant,**

v.

**James MARKS, Appellee.**

**No. 11–07–00019–CV.**

Court of Appeals of Texas, Eastland.

July 3, 2008.

---

Jane Lipscomb Stone, Erin K. Holmes, Stone Loughlin & Swanson, LLP, Attorneys At Law, Austin, TX, for appellant.

Donald G. MacPhail, Attorney At Law, Abilene, TX, for appellee.

Panel consists of: WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

TERRY McCALL, Justice.

This is a workers' compensation case. Appellee, James Marks, suffered an on-the-job knee injury while in the course and scope of his employment with appellant, Abilene Independent School District. AISD did not dispute that Marks tore the medial meniscus in his left knee and that, therefore, the torn meniscus was a compensable injury. However, AISD disputed that the on-the-job injury caused chondromalacia in Marks's left patella and chondromalacia in his left medial femoral condyle. The appeals panel for the Texas Workers' Compensation Commission found that Marks's compensable injury included the chondromalacia and that Marks had a 15% impairment rating.[1] AISD sought judicial review, and following a bench trial, the trial court rendered judgment that the compensable injury included the chondromalacia and that Marks's impairment rating was 15%. AISD attacks the trial court's judgment in three appellate issues. We affirm.

*Background*

On April 11, 2003, Marks was employed as a teacher at Clack Middle School in Abilene, Texas. On that date, Marks saw two female students fighting in a hallway. One of the students was sitting on top of the other student and beating her in the face. Marks told the student to get up, but she would not quit hitting the other student. Marks got behind the student, picked her up, and spun her to the side to get her away from the other student. Marks held the student from behind and told her that he would let her go when she calmed down. The student started kicking at him and kicked him in the left knee several times. The student was wearing large platform heels.

Marks did not have any knee problems before the April 11, 2003 incident. He started experiencing left knee problems after the incident. He received treatment from a number of health care providers. He saw Dr. Dale Funk, an orthopedic surgeon, in May 2003. Dr. Funk diagnosed Marks with a torn medial meniscus in his left knee, chondromalacia of the left patella, and chondromalacia of the left medial femoral condyle. On May 22, 2003, Dr. Funk performed arthroscopic surgery consisting of a left knee partial medial meniscectomy and chondroplasties of the patella and the medial femoral condyle.

After the surgery, Marks continued to experience left knee problems. The Commission selected John Judd, M.D., an orthopedic surgeon, as its designated doctor to review the claim. On December 22, 2003, Dr. Judd saw Marks for the purpose of determining whether he had reached

---

1. The legislature abolished the Texas Workers' Compensation Commission on September 1, 2005, and transferred its responsibilities to the Texas Department of Insurance, Division of Workers' Compensation. Act of May 29, 2005, 79th Leg. R.S., ch. 265 §§ 8.001(b), 8.004(a), 2005 Tex. Sess. Law Serv. 608. This case arose before the legislature abolished the Commission; therefore, we will refer to the Commission in this opinion.

maximum medical improvement and, "if so, the percentage of Marks's impairment, if any. Dr. Judd stated in his report that Marks had taken "a direct blow to the patella which severely damaged the patellofemoral cartilage at the time of the accident." He also stated that "[t]here certainly may have been some pre-existing chondromalacia but this patient appears to have sustained a direct contusion to the patella and therefore, a significant exacerbation of any pre-existing chondromalacia." Dr. Judd concluded that Marks had not reached maximum medical improvement.

On February 24, 2004, Marks saw Dr. Shannon E. Cooke, an orthopedic surgeon. Dr. Cooke's initial impression was that Marks had "[e]arly osteoarthritis with perhaps a recurrent tear and probably some arthrofibrosis in the anterior compartment." Dr. Cooke performed a second arthroscopic surgery on Marks's left knee on March 24, 2004. The surgery consisted of a "three-compartment abrasion chondroplasty and synovectomy, and lysis of adhesions." Dr. Cooke's post-operative diagnosis was post-traumatic arthritis, synovitis, and arthrofibrosis in the left knee.

Marks showed considerable improvement after the second surgery. Marks saw Dr. Judd on June 11, 2004. Dr. Judd stated in his report that he felt "that the findings of the post-traumatic arthritis directly correlate to the trauma that this patient suffered to the knee from the multiple kicks and the torn medial meniscus." Dr. Judd concluded that Marks had not reached maximum medical improvement. Marks again saw Dr. Judd on September 18, 2004. Dr. Judd stated in his report that "[i]t is my feeling that the patient's chondromalacia and wear under the patella is directly related to the accident in which he had a direct contusion to the patellofemoral joint." Dr. Judd also stated that

Marks had reached maximum medical improvement on June 29, 2004, and that he had a 15% impairment rating.

During the workers' compensation proceeding, AISD contended that Marks's chondromalacia was not related to the April 11 incident. AISD contended that the chondromalacia was a preexisting ordinary disease of life. On November 4, 2004, Marks saw Peter B. Robinson, M.D., AISD's choice of doctor for a required medical examination. Dr. Robinson concluded that the chondromalacia of the left patella and the chondromalacia of the left medial femoral condyle were not related to the April 11 incident but were instead preexisting conditions. Dr. Robinson also concluded that Marks's impairment rating was 1%.

The Commission held a contested case hearing on February 10, 2005. Following the hearing, the hearing officer issued a decision and order. The hearing officer stated that "[t]he medical records show, within a reasonable degree of medical probability, that the chondromalacia of the patellae and chondromalacia of the medial femoral condyle, while possibly pre-existing, were enhanced, worsened or accelerated by the compensable injury of April 11, 2003." The hearing officer also stated that the preponderance of the credible medical evidence showed that Marks had sustained damage or harm to his left knee, including the medial meniscus tear, post-traumatic chondromalacia of the patella, and chondromalacia of the medial femoral condyle, during the April 11, 2003 work incident. Thus, the hearing officer concluded that the compensable injury included the chondromalacia of the patella and the chondromalacia of the medial femoral condyle and that Marks's impairment rating was 15%. The appeals panel affirmed the hearing officer's decision.

AISD sought judicial review of the appeals panel's decision by filing this case in the trial court. After taking Dr. Cooke's deposition, AISD filed a motion to strike expert testimony of Dr. Cooke on the grounds (1) that he was not qualified to give an opinion on causation, (2) that his opinion was not reliable, and (3) that his opinion was not based on reasonable medical probability. The case proceeded to a bench trial on May 11, 2006. Before hearing evidence, the trial court heard AISD's motion to strike Dr. Cooke's testimony. The trial court denied the motion. Marks presented deposition testimony from Dr. Cooke. Dr. Cooke testified that, in his opinion, the trauma to the left knee that Marks sustained during the April 11, 2003 incident caused the chondromalacia in the patella and the chondromalacia in the medial femoral condyle. AISD presented Dr. Marvin Van Hal, an orthopedic surgeon, as an expert witness. Dr. Van Hal testified that the chondromalacia was a preexisting degenerative condition and that it was not worsened or aggravated by the April 11, 2003 incident.

The trial court entered a judgment in favor of Marks. In the judgment, the trial court found that the compensable injury included the chondromalacia and that Marks's impairment rating was 15%. Neither party requested findings of fact or conclusions of law.

## Issues on Appeal

AISD presents three issues for review. In its first issue, AISD contends that the trial court erred in admitting Dr. Cooke's opinion testimony on the issue of causation of the chondromalacia (1) because he was not qualified to testify as an expert witness regarding causation of the medical issues, (2) because his opinion on causation was not reliable, and (3) because his testimony failed to establish a causal link between the April 11, 2003 work injury and the chondromalacia to a reasonable medical probability. In its second issue, AISD asserts that the trial court erred in finding that Marks had an impairment rating of 15% because the impairment rating included the chondromalacia, which was not part of the compensable injury. In its third issue, AISD contends that the trial court's error in admitting Dr. Cooke's causation testimony constituted reversible error because it caused the rendition of an improper judgment on the issue of whether Marks's work injury caused the chondromalacia and on the issue of Marks's impairment rating.

## Compensable Injuries

■ A compensable injury is an "injury that arises out of and in the course and scope of employment for which compensation is payable under [the Texas Workers' Compensation Act, TEX. LAB.CODE ANN. tit. 5, subtit. A (Vernon 2006 and Supp. 2007) ]." Section 401.011(10). Injury is defined as "damage or harm to the physical structure of the body and a disease or infection naturally resulting from the damage or harm." Section 401.011(26). The term "injury" includes an occupational disease. *Id.* The term "occupational disease" does not include "an ordinary disease of life to which the general public is exposed outside of employment, unless that disease is an incident to a compensable injury or occupational disease." Section 401.011(34). The term "injury" also includes the aggravation of preexisting conditions or injuries. *Cooper v. St. Paul Fire & Marine Ins. Co.,* 985 S.W.2d 614, 616–18 (Tex.App.-Amarillo 1999, no pet.).

## Standard of Review

■ The district court reviews the appeals panel's decision on issues involving the compensability of an injury under a

modified de novo review. *Morales v. Liberty Mut. Ins. Co.*, 241 S.W.3d 514, 516–18 (Tex.2007); *Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 515 (Tex.1995). As the party appealing the appeals panel's decision in this case, AISD had the burden at trial to prove by a preponderance of the evidence that Marks's compensable injury did not include the chondromalacia of the left patella and the chondromalacia of the left medial femoral condyle. Sections 410.301(a), 410.303; *Morales*, 241 S.W.3d at 516. In a bench trial, the trial court "shall consider the decision of the appeals panel" in rendering its judgment. Section 410.304(b). However, the trial court is not required to accord the decision any particular weight. *Garcia*, 893 S.W.2d at 528; *ESIS, Inc., Servicing Contractor v. Johnson*, 908 S.W.2d 554, 560 (Tex.App.-Fort Worth 1995, writ denied). In addition, the designated doctor's opinion regarding impairment is accorded no special weight. *Fin. Ins. Co. v. Ragsdale*, 166 S.W.3d 922, 928 (Tex.App.-El Paso 2005, no pet.). Evidence at the modified trial de novo in the district court "shall be adduced as in other civil trials." Section 410.306.

### *Dr. Cooke's Causation Testimony*

■ In its first issue, AISD contends that Dr. Cooke's causation testimony was inadmissible for three reasons: (1) that he was not qualified to give expert medical testimony on causation; (2) that his opinion was not reliable; and (3) that his testimony failed to establish a causal link between the April 11 injury and the chondromalacia to a reasonable medical probability. The general rule is that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors. *Guevara v. Ferrer*, 247 S.W.3d 662 (Tex.2007). In the absence of expert medical testimony, laypersons do not have

the common knowledge and experience to adequately evaluate the cause of Marks's chondromalacia. Therefore, expert medical testimony was required to establish causation of the chondromalacia.

■ Rule 702 of the Texas Rules of Evidence governs the admissibility of expert testimony. TEX.R. EVID. 702; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 554 (Tex.1995). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Expert testimony is admissible if (1) the expert is qualified and (2) the testimony is relevant and based on a reliable foundation. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex.2006); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001); *Robinson*, 923 S.W.2d at 556. The trial court makes the initial determination about whether the expert and the proffered testimony meet these requirements. *Wilkins*, 47 S.W.3d at 499. The trial court has broad discretion to determine admissibility, and we will reverse only if there is an abuse of that discretion. *Id.*; *see also Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex.2006); *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex.1996). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Robinson*, 923 S.W.2d at 558.

■ The party offering the expert's testimony bears the burden of establishing that the witness is qualified as an expert. *Broders*, 924 S.W.2d at 151. The offering party must show that the expert has

knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on the particular subject. *Id.* at 153. In deciding whether an expert is qualified, the trial court must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion. *Mendez,* 204 S.W.3d at 800; *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 719 (Tex.1998).

▉ In determining whether expert testimony is reliable, we review an expert's testimony in its entirety and will not accept the expert's opinion as some evidence "simply because he used the magic words." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711–12 (Tex.1997) (quoting *Schaefer v. Tex. Employers' Ins. Ass'n,* 612 S.W.2d 199, 202–04 (Tex.1980)). In *Robinson,* the court identified six factors that trial courts may consider in determining whether expert testimony is reliable: (1) the extent to which the expert's theory has been or can be tested; (2) the extent to which the expert's technique relies upon his own subjective interpretation; (3) whether the expert's theory has been subjected to peer review and publication; (4) the potential rate of error of the theory; (5) whether the expert's theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses that have been made of the expert's theory or technique. *Robinson,* 923 S.W.2d at 557. The factors in *Robinson* are nonexclusive, and Rule 702 contemplates a flexible inquiry. *Mendez,* 204 S.W.3d at 801. The *Robinson* factors cannot always be used in assessing an expert's reliability, but "there must be some basis for the opinion offered to show its reliability." *Mendez,* 204 S.W.3d at 801; *Gammill,* 972 S.W.2d at 726. The *Robinson* relevance and reliability requirements apply to all expert testimony. *Mendez,* 204 S.W.3d at 801.

▉ To constitute evidence of causation, a medical expert's opinion must rest in reasonable medical probability. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 500 (Tex.1995); *LMC Complete Auto., Inc. v. Burke,* 229 S.W.3d 469, 478 (Tex.App.-Houston [1st Dist.] 2007, pet. denied). Thus, expert testimony that is not based on reasonable medical probability but instead relies on possibility, speculation, or surmise provides no evidence of causation. *Havner,* 953 S.W.2d at 712; *Schaefer,* 612 S.W.2d at 204–05. Reasonable probability is determined by the substance and context of the opinion and does not turn on semantics or the use of a particular term or phrase. *Crye,* 907 S.W.2d at 500.

We, therefore, review Dr. Cooke's testimony to determine whether his testimony on the cause of Marks's chondromalacia was admissible expert testimony. Dr. Cooke graduated from the University of Texas Medical Branch in Galveston, Texas. He did a transitional internship for one year at the University of Mississippi Medical Center and then did an orthopedic surgery residency for four years. Dr. Cooke joined the United States Air Force and served as a staff orthopedic surgeon at Tyndall Air Force Base in Panama City, Florida. During his last year of active duty, he served as the chief of orthopedic services at Tyndall Air Force Base. Dr. Cooke then went into private practice as an orthopedic surgeon in Abilene, Texas. At the time of testifying in this case, Dr. Cooke had been in private practice in Abilene for eight and one-half years.

Dr. Cooke said that he had not testified as an expert witness in any other cases and that he had not testified in any workers' compensation matters. He also said that he was not authorized or credentialed

through the Commission to do impairment rating exams. Dr. Cooke testified that, as a treating physician, his job was to take care of patients and was not to determine causation of medical conditions.

Dr. Cooke testified that he probably did between twenty and twenty-five surgeries a week and that probably at least half of the surgeries were to the knee. He also testified that chondromalacia is softening of the cartilage and that it has varying degrees. Dr. Cooke had often seen chondromalacia in his years of practice as an orthopedic surgeon, and he testified that he was qualified to diagnose and treat chondromalacia.

Marks first saw Dr. Cooke on February 24, 2004. Dr. Cooke took a history from Marks. Marks told him that he had broken up a fight at school between two girls. Marks also told him that he had been kicked and had sustained a twisting injury to his knee. Dr. Cooke performed a physical examination of Marks on February 24, 2004. At that time, Dr. Cooke diagnosed Marks with early osteoarthritis with perhaps a recurrent tear of the medial meniscus and probably some arthrofibrosis in the anterior compartment. During his testimony, Dr. Cooke explained the process for determining a diagnosis. He said that he relied on the history given by the patient, the physical examination, and available objective data. He said that, as per standard medical practice, a diagnosis may change over time as additional information is received. Dr. Cooke testified that his diagnosis in this case changed as he received more information.

Dr. Cooke testified that, in his opinion, blunt force trauma that Marks sustained to his left knee during the April 11, 2003 incident caused the chondromalacia in the patella and the chondromalacia in the medial femoral condyle. Dr. Cooke identified a number of factors supporting his opinion.

Dr. Cooke testified that medical literature, including the book, *Orthopaedic Sports Medicine, Principles and Practice*, supported his opinion. *See* 1 Jesse C. DeLee, M.D., and David Drez, Jr., M.D., *Orthopaedic Sports Medicine, Principles and Practice*, ch. 2 (1994). Dr. Cooke said that a significant part of his opinion was based on the fact that Marks had not had any knee pain before the April 11, 2003 incident. He also said that the physical examination is of paramount importance in determining a diagnosis. He also said that there was a significant temporal relationship "in terms of his injury to the time of his first surgery and progressively, until the time I saw him" and that "[a] problem magnified over time will get worse." Dr. Cooke also testified that his opinion was based on the basic science of cartilage injury.

Dr. Cooke also testified that the objective data supported his opinion. He said that Dr. Funk's surgery revealed a visible chondral injury, which evidenced blunt trauma to Marks's knee. Dr. Cooke said that the surgical pictures dated May 22, 2003, from Dr. Funk's surgery showed evidence of chondromalacia of the patella and chondromalacia of the medial femoral condyle. When Dr. Cooke performed the surgery on Marks's left knee on March 24, 2004, he found a progression of Marks's chondral injury. Dr. Cooke said that he could not answer whether Marks had any chondromalacia in his knees before the April 11, 2003 incident; however, he said that Marks related no symptoms before the incident and that there was no medical evidence that Marks had any problem with his left knee prior to the injury date. Dr. Cooke also testified that the April 11, 2003 work injury caused damage or harm to Marks's left knee because it caused chondral injury to the patella and to the medial femoral condyle.

AISD asserts that Dr. Cooke was not qualified to testify as an expert witness on the causation of Marks's knee conditions. Dr. Cooke's testimony established that he was an experienced orthopedic surgeon. As an orthopedic surgeon, he treated knee injuries and performed multiple knee surgeries each week. He had often seen chondromalacia during his years of practice. He was aware of the causes of chondromalacia. Dr. Cooke took a history from Marks, reviewed some of the medical records relating to Marks's prior medical treatment, examined Marks, and performed the second surgery on Marks. Dr. Cooke's testimony showed that he had knowledge, skill, experience, training, or education regarding causation of chondromalacia that qualified him to give an opinion on the causation of Marks's chondromalacia. The fact that Dr. Cooke's job duties as a treating physician did not include determining causation issues did not disqualify him from testifying as an expert witness in this case. Nor did the fact that Dr. Cooke had not previously testified as an expert witness disqualify him from testifying as an expert witness in this case. Based on the evidence, the trial court did not abuse its discretion in concluding that Dr. Cooke was qualified to give expert opinion testimony on causation. *See Mem'l Hermann Healthcare Sys. v. Burrell,* 230 S.W.3d 755, 762–63 (Tex.App.-Houston [14th Dist.] 2007, no pet.).

AISD argues that Dr. Cooke's causation testimony was unreliable for a number of reasons: (1) that he based the opinion "solely on unsubstantiated assumptions, rather than an actual review of relevant medical records"; (2) that he used flawed reasoning and methodology because he based the opinion "primarily on the temporal relationship between the injury and the diagnosis, and upon his incorrect assumption that there [was] no evidence of any pre-existing condition"; and (3) that his

testimony was inconsistent with information contained in his earlier reports.

Dr. Cooke reviewed some of Marks's medical records, including a report of an MRI taken in December 2003 and MRI films taken in March 2004, during the time period that he was providing treatment to Marks. AISD's counsel questioned Dr. Cooke during his deposition testimony about additional medical records, including a report from April 17, 2003 X-rays of Marks's left knee and a report from a May 1, 2003 MRI taken of Marks's left knee. During his testimony, Dr. Cooke explained in detail that the May 1 MRI, which was taken about three weeks after Marks sustained the trauma to his left knee, provided further support for his opinion that the April 11, 2003 work incident caused the chondromalacia. The April 17 X-ray report stated that Marks had small bony spurs on the posterior margin of his left patella that were consistent with degenerative change. The "degenerative change" referred to in the X-ray report was not in reference to possible degenerative changes in the cartilage. Dr. Cooke explained that degeneration of the cartilage cannot be seen on plain X-ray film and that chondromalacia cannot be diagnosed on a plain X-ray.

■■■ During his testimony, Dr. Cooke addressed general causation and specific causation. In this case, the general causation inquiry is whether trauma to the knee can cause chondromalacia; the specific causation inquiry is whether the trauma to Mark's left knee caused his chondromalacia. *See Havner,* 953 S.W.2d at 714–15. With respect to general causation, Dr. Cooke testified that Chapter Two of *Orthopaedic Sports Medicine, Principles and Practice,* and other medical literature supported his diagnosis. Chapter Two of *Orthopaedic Sports Medicine, Principles and*

*Practice,* explains that direct blunt trauma and severe blunt trauma can cause cartilage damage and injury. With respect to specific causation, Dr. Cooke based his opinion that the April 11 incident caused the chondromalacia on a number of factors, including the history he took from Marks; the physical examination he performed on Marks; the temporal relationship between the April 11, 2003 incident and the progression of the chondromalacia; objective data in the medical records that he had reviewed; the progression of the chondromalacia that he found during the March 24, 2004 surgery; Marks's lack of left knee pain before the April 11, 2003 incident; the basic science of cartilage injury; and medical literature supporting his opinion. The fact that Dr. Cooke had not reviewed some of Marks's medical records before giving his deposition testimony did not render his opinion unreliable. The record shows that Dr. Cooke reviewed sufficient medical evidence to render a reliable opinion. A failure to review additional medical records would go to the weight of Dr. Cooke's testimony rather than its admissibility. *See Burke,* 229 S.W.3d at 478 (The weakness of facts in support of an expert's opinion generally goes to the weight of the testimony rather than its admissibility.).

■ Evidence of the temporal proximity, that is, closeness in time, between the April 11, 2003 incident and Marks's subsequently manifested physical conditions was relevant to the causation issue. *Guevara,* 247 S.W.3d at 668. Thus, Dr. Cooke did not use flawed reasoning and methodology in considering temporal proximity and basing his opinion, in part, on the temporal relationship between the April 11, 2003 event and the progression of Marks's chondromalacia. Dr. Cooke did not base his opinion solely on the temporal relationship between the April 11 injury and the diag-nosis. Rather, he based his opinion on the factors set forth above.

■ Dr. Cooke first saw Marks on February 24, 2004. On that date, Dr. Cooke diagnosed Marks with early osteoarthritis with perhaps a recurrent tear of the medial meniscus and probably some arthrofibrosis in the anterior compartment. Dr. Cooke testified that, per standard medical practice, a diagnosis may change over time as additional information is received. He also testified that, after receiving additional information in this case, he changed his diagnosis of Marks to chondromalacia. Dr. Cooke explained in detail the facts that led him to change his diagnosis. The fact that Dr. Cooke testified to a diagnosis that differed from diagnoses contained in his earlier medical records did not make his causation opinion unreliable.

■ The causation testimony of AISD's expert, Dr. Van Hal, conflicted with Dr. Cooke's causation testimony. A trial court's gatekeeping function under Rule 702 is not to determine whether an expert's conclusions are correct, but only whether the analysis used to reach them was reliable. *Gammill,* 972 S.W.2d at 728. For the reasons set forth above, Dr. Cooke's testimony demonstrated that his causation opinion had a reliable foundation. Therefore, the trial court did not abuse its discretion in concluding that Dr. Cooke's causation testimony was sufficiently reliable to be admitted into evidence. *See Burke,* 229 S.W.3d at 478–79 (The court held that a neurosurgeon's causation opinion—that an accident made it necessary for an employee to undergo back surgeries—was sufficiently reliable to support the jury's negligence finding.).

AISD also argues that Dr. Cooke failed to establish a causal link between Marks's April 11, 2003 injury and his chondromalacia to a reasonable medical probability.

The facts discussed above show the substance and context of Dr. Cooke's causation opinion. The evidence showed that Dr. Cooke was an experienced orthopedic surgeon who regularly treated knee injuries. He was familiar with chondromalacia; he had often seen the condition during his years of practice. As set forth in detail above, his testimony demonstrated that his causation opinion was based on a number of factors. A review of the substance and context of Dr. Cooke's causation opinion shows that it was based on reasonable medical probability and not on possibility, speculation, or surmise.

██ The trial court did not abuse its discretion in admitting Dr. Cooke's expert opinion testimony that the April 11, 2003 incident caused Marks's chondromalacia in his left patella and the chondromalacia in his left medial femoral condyle. Therefore, we overrule AISD's first issue.

### Trial Court's Impairment Rating Finding

██ Dr. Judd, the Commission's designated doctor, concluded that Marks's compensable injury included the chondromalacia. Therefore, Dr. Judd gave Marks a 15% impairment rating. Dr. Robinson, the doctor chosen by AISD to perform a required medical examination, concluded that Marks's chondromalacia was not a compensable injury because it was a preexisting condition. Dr. Robinson also concluded that Marks's impairment rating was 1%. The trial court adopted Dr. Judd's 15% impairment rating. *See* Section 410.306(c).

AISD's second and third issues are based on its contention that the trial court erroneously admitted Dr. Cooke's expert causation testimony. In its second issue, AISD contends that, because Dr. Cooke offered the only expert medical causation testimony and because Dr. Cooke's causation testimony was inadmissible, the evidence was legally insufficient to support the trial court's finding that the compensable injury included the chondromalacia. Without evidence establishing that the compensable injury included the chondromalacia, AISD contends that the trial court erred in finding that Marks had a 15% impairment rating. In its third issue, AISD asserts that the trial court's erroneous admission of Dr. Cooke's causation testimony caused the rendition of an improper judgment. We have ruled that Dr. Cooke's testimony was admissible. Therefore, we overrule AISD's second and third issues.

However, we will address whether Dr. Cooke's testimony was the only admissible expert medical evidence on causation. The *Crye* court stated the rule that an expert's opinion must rest in reasonable medical probability to constitute evidence of causation. *Crye*, 907 S.W.2d at 500. The court then explained that "[t]his rule applies whether the opinion is expressed in testimony or in a medical record, as the need to avoid opinions based on speculation and conjecture is identical in both situations." *Id.* Dr. Judd did not testify at trial. However, AISD introduced Dr. Judd's medical records into evidence. The records showed that Dr. Judd examined Marks on three occasions to determine whether he had reached maximum medical improvement and to assess Marks's impairment rating, if any. The records also included a December 1, 2004 letter by Dr. Judd to the Commission in which Dr. Judd disagreed with the conclusions of Dr. Robinson, AISD's required medical examination doctor.

Dr. Judd saw Marks on December 22, 2003, June 11, 2004, and September 18, 2004. Dr. Judd's records showed that he reviewed a substantial number of Marks's medical records. Dr. Judd took a detailed

initial history from Marks during the December 22, 2003 visit and updated the histories during the next two visits. During the initial history, Marks reported that he had broken up a fight and that a girl had kicked him directly in the knee and thigh. Marks gave a history of a direct blow to the patella. Dr. Judd performed physical examinations of Marks during each of the three visits.

During the December 22, 2003 visit, Dr. Judd diagnosed Marks, in part, with "[c]hondromalacia, severe, patellofemoral joint with history of direct contusion to the patella at the time of injury." Dr. Judd's impression was "that [Marks] may have had some mild or even moderate arthritis but that he took a direct blow to the patella which severely damaged the patellofemoral cartilage at the time of the accident." Dr. Judd also stated that "[t]here certainly may have been some pre-existing chondromalacia but this patient appears to have sustained a direct contusion to the patella and therefore, a significant exacerbation of any pre-existing chondromalacia." Dr. Judd concluded that Marks had not reached maximum medical improvement on December 22, 2003.

Dr. Judd's June 11, 2004 examination followed Dr. Cooke's surgery. After examining Marks, Dr. Judd diagnosed Marks, in part, with "[c]hondromalacia, medial femoral articular surface, lateral femoral articular surface and patellofemoral joint." Dr. Judd also diagnosed Marks with post-traumatic arthritis and synovitis in the left knee. Dr. Judd did not believe that Marks's condition was age-related. Instead, Dr. Judd concluded that Marks's findings "[were] more compatible with direct trauma and damage to the articular cartilage at the time of the accident." Dr. Judd again concluded that Marks had not reached maximum medical improvement on June 11, 2004.

During the September 18, 2004 visit, Dr. Judd diagnosed Marks, in part, with chondromalacia of the left patella and chondromalacia of the left medial femoral condyle. Dr. Judd stated that "[it] is my feeling that [Marks's] chondromalacia and wear under the patella is directly related to the accident in which he had a direct contusion to the patellofemoral joint." Dr. Judd concluded that Marks had reached maximum medical improvement on June 29, 2004, and assigned a 15% impairment rating. The impairment rating included ratings for chondromalacia of the left patella and chondromalacia of the left medial femoral condyle.

In the December 1, 2004 letter, Dr. Judd responded to Dr. Robinson's assessment that Marks's chondromalacia was a preexisting condition. Dr. Judd stated that Dr. Robinson had "basically decided to totally ignore the fact that [Marks] was kicked directly in the knee and had direct trauma to the patellofemoral joint as a result of the accident." Dr. Judd also stated that "[c]ertainly routine chondromalacia does take years to occur but the accident specifically caused chondromalacia due to the direct kick to the knee and is therefore compensable and is not something to just be ignored as being related to an injury without any history of trauma."

Dr. Judd was the Commission's designated doctor to assess whether Marks had reached maximum medical improvement and, if so, the percentage of his impairment, if any. To serve as a designated doctor, Dr. Judd was required to meet specific qualifications, including training in the determination of impairment ratings. *See* Section 408.1225. The evidence showed that Dr. Judd was an orthopedic surgeon. Dr. Judd's medical records established that his causation opinion was based on a number of factors, including his review of Marks's medical records, the his-

tories taken from Marks, and three physical examinations of Marks. The evidence established that Dr. Judd was qualified to give expert opinion testimony on causation, and Dr. Judd's medical records established that his causation opinion was reliable and based on reasonable medical probability.

Dr. Judd's causation opinion satisfied the requirements for admissibility of expert opinion evidence. As such, his opinion that the April 11, 2003 work injury caused Marks's chondromalacia provided further evidentiary support for the trial court's findings that the April 11, 2003 incident caused Marks's chondromalacia and that Marks had an impairment rating of 15%.

## This Court's Ruling

We affirm the judgment of the trial court.