Opinion filed July 3, 2008











 
 
  
 
 







 
 
  
 
 




Opinion filed July 3, 2008

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-07-00019-CV

                                                    __________

 

                ABILENE INDEPENDENT SCHOOL DISTRICT, Appellant

                                                             V.

                                          JAMES
MARKS, Appellee

 



 

                                          On
Appeal from the 42nd District Court

                                                          Taylor
County, Texas

                                                  Trial
Court Cause No. 46240-A

 



 

                                                                   O
P I N I O N








This
is a workers=
compensation case.  Appellee, James Marks, suffered an on-the-job knee injury
while in the course and scope of his employment with appellant, Abilene
Independent School District.  AISD did not dispute that Marks tore the medial
meniscus in his left knee and that, therefore, the torn meniscus was a
compensable injury.  However, AISD disputed that the on-the-job injury caused
chondromalacia in Marks=s
left patella and chondromalacia in his left medial femoral condyle.  The
appeals panel for the Texas Workers=
Compensation Commission found that Marks=s
compensable injury included the chondromalacia and that Marks had a 15%
impairment rating.[1] AISD sought
judicial review, and following a bench trial, the trial court rendered judgment
that the compensable injury included the chondromalacia and that Marks=s impairment rating was
15%. AISD attacks the trial court=s
judgment in three appellate issues.  We affirm.

                                                                    Background

On
April 11, 2003, Marks was employed as a teacher at Clack Middle School in
Abilene, Texas.  On that date, Marks saw two female students fighting in a
hallway.  One of the students was sitting on top of the other student and
beating her in the face.  Marks told the student to get up, but she would not
quit hitting the other student.  Marks got behind the student, picked her up,
and spun her to the side to get her away from the other student.  Marks held
the student from behind and told her that he would let her go when she calmed
down.  The student started kicking at him and kicked him in the left knee
several times.  The student was wearing large platform heels.

Marks
did not have any knee problems before the April 11, 2003 incident.  He started
experiencing left knee problems after the incident.  He received treatment from
a number of health care providers.  He saw Dr. Dale Funk, an orthopedic
surgeon, in May 2003.  Dr. Funk diagnosed Marks with a torn medial meniscus in
his left knee, chondromalacia of the left patella, and chondromalacia of the
left medial femoral condyle.  On May 22, 2003, Dr. Funk performed arthroscopic
surgery consisting of a left knee partial medial meniscectomy and
chondroplasties of the patella and the medial femoral condyle.

After
the surgery, Marks continued to experience left knee problems.  The Commission
selected John Judd, M.D., an orthopedic surgeon, as its designated doctor to
review the claim.  On December 22, 2003, Dr. Judd saw Marks for the purpose of
determining whether he had reached maximum medical improvement and, if so, the
percentage of Marks=s
impairment, if any.  Dr. Judd stated in his report that Marks had taken Aa direct blow to the
patella which severely damaged the patellofemoral cartilage at the time of the
accident.@  He also
stated that  A[t]here
certainly may have been some pre-existing chondromalacia but this patient
appears to have sustained a direct contusion to the patella and therefore, a
significant exacerbation of any pre-existing chondromalacia.@  Dr. Judd concluded that
Marks had not reached maximum medical improvement.








On
February 24, 2004, Marks saw Dr. Shannon E. Cooke, an orthopedic surgeon. 
Dr. Cooke=s
initial impression was that Marks had A[e]arly
osteoarthritis with perhaps a recurrent tear and probably some arthrofibrosis
in the anterior compartment.@ 
Dr. Cooke performed a second arthroscopic surgery on Marks=s left knee on March 24,
2004.  The surgery consisted of a Athree-compartment
abrasion chondroplasty and synovectomy, and lysis of adhesions.@  Dr. Cooke=s post-operative diagnosis
was post-traumatic arthritis, synovitis, and arthrofibrosis in the left knee.

Marks
showed considerable improvement after the second surgery.  Marks saw Dr. Judd
on June 11, 2004.  Dr. Judd stated in his report that he felt Athat the findings of the
post-traumatic arthritis directly correlate to the trauma that this patient
suffered to the knee from the multiple kicks and the torn medial meniscus.@  Dr. Judd concluded that
Marks had not reached maximum medical improvement.  Marks again saw Dr. Judd on
September 18, 2004.  Dr. Judd stated in his report that A[i]t is my feeling that the patient=s chondromalacia and wear
under the patella is directly related to the accident in which he had a direct
contusion to the patellofemoral joint.@ 
Dr. Judd also stated that Marks had reached maximum medical improvement on June
29, 2004, and that he had a 15% impairment rating.

During
the workers=
compensation proceeding, AISD contended that Marks=s chondromalacia was not related to the April
11 incident.  AISD contended that the chondromalacia was a preexisting ordinary
disease of life.  On November 4, 2004, Marks saw Peter B. Robinson, M.D., AISD=s choice of doctor for a
required medical examination.  Dr. Robinson concluded that the chondromalacia
of the left patella and the chondromalacia of the left medial femoral condyle
were not related to the April 11 incident but were instead preexisting
conditions.  Dr. Robinson also concluded that Marks=s impairment rating was 1%.








The
Commission held a contested case hearing on February10, 2005.  Following the
hearing, the hearing officer issued a decision and order.  The hearing officer
stated that A[t]he
medical records show, within a reasonable degree of medical probability, that
the chondromalacia of the patellae and chondromalacia of the medial femoral
condyle, while possibly pre-existing, were enhanced, worsened or accelerated by
the compensable injury of April 11, 2003.@ 
The hearing officer also stated that the preponderance of the credible medical
evidence showed that Marks had sustained damage or harm to his left knee,
including the medial meniscus tear, post-traumatic chondromalacia of the
patella, and chondromalacia of the medial femoral condyle, during the April 11,
2003 work incident.  Thus, the hearing officer concluded that the compensable
injury included the chondromalacia of the patella and the chondromalacia of the
medial femoral condyle and that Marks=s
impairment rating was 15%.  The appeals panel affirmed the hearing officer=s decision.

AISD
sought judicial review of the appeals panel=s
decision by filing this case in the trial court.  After taking Dr. Cooke=s deposition, AISD filed a
motion to strike expert testimony of Dr. Cooke on the grounds (1) that he
was not qualified to give an opinion on causation, (2) that his opinion was not
reliable, and (3) that his opinion was not based on reasonable medical
probability.  The case proceeded to a bench trial on May 11, 2006.  Before
hearing evidence, the trial court heard AISD=s
motion to strike Dr. Cooke=s
testimony.  The trial court denied the motion.  Marks presented deposition
testimony from Dr. Cooke.  Dr. Cooke testified that, in his opinion, the trauma
to the left knee that Marks sustained during the April 11, 2003 incident caused
the chondromalacia in the patella and the chondromalacia in the medial femoral
condyle.  AISD presented Dr. Marvin Van Hal, an orthopedic surgeon, as an
expert witness.  Dr. Van Hal testified that the chondromalacia was a
preexisting degenerative condition and that it was not worsened or aggravated
by the April 11, 2003 incident.

The
trial court entered a judgment in favor of Marks.  In the judgment, the trial
court found that the compensable injury included the chondromalacia and that
Marks=s impairment
rating was 15%.  Neither party requested findings of fact or conclusions of
law.

                                                                 Issues
on Appeal

AISD
presents three issues for review.  In its first issue, AISD contends that the
trial court erred in admitting Dr. Cooke=s
opinion testimony on the issue of causation of the chondromalacia (1) because
he was not qualified to testify as an expert witness regarding causation of the
medical issues, (2) because his opinion on causation was not reliable, and (3)
because his testimony failed to establish a causal link between the April 11,
2003 work injury and the chondromalacia to a reasonable medical probability. 
In its second issue, AISD asserts that the trial court erred in finding that
Marks had an impairment rating of 15% because the impairment rating included
the chondromalacia, which was not part of the compensable injury.  In its third
issue, AISD contends that the trial court=s
error in admitting Dr. Cooke=s
causation testimony constituted reversible error because it caused the
rendition of an improper judgment on the issue of whether Marks=s work injury caused the
chondromalacia and on the issue of Marks=s
impairment rating.








                                                             Compensable
Injuries

A
compensable injury is an Ainjury
that arises out of and in the course and scope of employment for which
compensation is payable under [the Texas Workers=
Compensation Act, Tex. Lab. Code Ann.
tit. 5, subtit. A (Vernon 2006 and Supp. 2007)].@ 
Section 401.011(10).  Injury is defined as Adamage
or harm to the physical structure of the body and a disease or infection
naturally resulting from the damage or harm.@ 
Section 401.011(26).  The term Ainjury@ includes an occupational
disease.  Id.  The term Aoccupational
disease@ does not
include Aan ordinary
disease of life to which the general public is exposed outside of employment,
unless that disease is an incident to a compensable injury or occupational
disease.@  Section
401.011(34).  The term Ainjury@ also includes the
aggravation of preexisting conditions or injuries.  Cooper v. St. Paul Fire
& Marine Ins. Co., 985 S.W.2d 614, 616-18 (Tex. App.CAmarillo 1999, no pet.).

                                                              Standard
of Review

The
district court reviews the appeals panel=s
decision on issues involving the compensability of an injury under a modified
de novo review.  Morales v. Liberty Mut. Ins. Co., 241 S.W.3d 514,  516-18
(Tex. 2007); Texas Workers=
Comp. Comm=n v.
Garcia, 893 S.W.2d 504, 515 (Tex. 1995).  As the party appealing the
appeals panel=s
decision in this case, AISD had the burden at trial to prove by a preponderance
of the evidence that Marks=s
compensable injury did not include the chondromalacia of the left patella and
the chondromalacia of the left medial femoral condyle.  Sections 410.301(a),
410.303; Morales, 241 S.W.3d at 516.  In a bench trial, the trial court Ashall consider the decision
of the appeals panel@
in rendering its judgment.  Section 410.304(b).  However, the trial court is
not required to accord the decision any particular weight.  Garcia, 893
S.W.2d at 528; Esis, Inc., Servicing Contractor v. Johnson, 908 S.W.2d
554, 560 (Tex. App.C
Fort Worth 1995, writ denied).  In addition, the designated doctor=s opinion regarding
impairment is accorded no special weight.  Fin. Ins. Co.  v. Ragsdale,
166 S.W.3d 922, 928 (Tex. App.CEl
Paso 2005, no pet.).  Evidence at the modified trial de novo in the district
court Ashall be
adduced as in other civil trials.@ 
Section 410.306.

                                                   Dr.
Cooke=s
Causation Testimony








In
its first issue, AISD contends that Dr. Cooke=s
causation testimony was inadmissible for three reasons: (1) that he was not
qualified to give expert medical testimony on causation; (2) that his opinion
was not reliable; and (3) that his testimony failed to establish a causal link
between the April 11 injury and the chondromalacia to a reasonable medical
probability.  The general rule is that expert testimony is necessary to
establish causation as to medical conditions outside the common knowledge and
experience of jurors.  Guevara v. Ferrer, 247 S.W.3d 662 (Tex. 2007). 
In the absence of expert medical testimony, laypersons do not have the common
knowledge and experience  to adequately evaluate the cause of Marks=s chondromalacia. 
Therefore, expert medical testimony was required to establish causation of the
chondromalacia.

            Rule
702 of the Texas Rules of Evidence governs the admissibility of expert
testimony.  Tex. R. Evid. 702; E.I.
du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 554 (Tex. 1995).  Rule 702 provides:

If
scientific, technical, or other specialized knowledge will assist the trier of
fact to understand the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience, training, or  education
may testify thereto in the form of an opinion or otherwise.

 

Expert testimony
is admissible if (1) the expert is qualified and (2) the testimony is relevant
and based on a reliable foundation.  Cooper Tire & Rubber Co. v. Mendez,
204 S.W.3d 797, 800 (Tex. 2006); Helena Chem. Co. v. Wilkins, 47 S.W.3d
486, 499 (Tex. 2001); Robinson, 923 S.W.2d at 556.  The trial court
makes the initial determination about whether the expert and the proffered
testimony meet these requirements.  Wilkins, 47 S.W.3d at 499.  The
trial court has broad discretion to determine admissibility, and we will
reverse only if there is an abuse of that discretion.  Id.; see also  Larson
v. Downing, 197 S.W.3d 303, 304-05 (Tex. 2006); Broders v. Heise,
924 S.W.2d 148, 151 (Tex. 1996).  A trial court abuses its discretion if it
acts without reference to any guiding rules or principles.  Robinson,
923 S.W.2d at 558.

The
party offering the expert=s
testimony bears the burden of establishing that the witness is qualified as an
expert.  Broders, 924 S.W.2d at 151.  The offering party must show that
the expert has knowledge, skill, experience, training, or education regarding
the specific issue before the court that would qualify the expert to give an
opinion on the particular subject.  Id. at 153.  In deciding whether an
expert is qualified, the trial court must ensure that those who purport to be
experts truly have expertise concerning the actual subject about which they are
offering an opinion.  Mendez, 204 S.W.3d at 800; Gammill v. Jack
Williams Chevrolet, Inc., 972 S.W.2d 713, 719 (Tex. 1998).








In
determining whether expert testimony is reliable, we review an expert=s testimony in its entirety
and will not accept the expert=s
opinion as some evidence Asimply
because he used the magic words.@ 
Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711-12 (Tex. 1997)
(quoting Schaefer v. Tex. Employers=
Ins. Ass=n,
612 S.W.2d 199, 202-04 (Tex. 1980)).  In Robinson, the court identified
six factors that trial courts may consider in determining whether expert
testimony is reliable: (1) the extent to which the expert=s theory has been or can be
tested; (2) the extent to which the expert=s
technique relies upon his own subjective interpretation; (3) whether the expert=s theory has been subjected
to peer review and publication; (4) the potential rate of error of the theory;
(5) whether the expert=s
theory or technique has been generally accepted as valid by the relevant
scientific community; and (6) the nonjudicial uses that have been made of the
expert=s theory or
technique.  Robinson, 923 S.W.2d at 557.  The factors in Robinson
are nonexclusive, and Rule 702 contemplates a flexible inquiry.  Mendez,
204 S.W.3d at 801.  The Robinson factors cannot always be used in
assessing an expert=s
reliability, but Athere
must be some basis for the opinion offered to show its reliability.@  Mendez, 204 S.W.3d
at 801; Gammill, 972 S.W.2d at 726.  The Robinson relevance and
reliability requirements apply to all expert testimony.  Mendez, 204
S.W.3d at 801.

To
constitute evidence of causation, a medical expert=s opinion must rest in reasonable medical
probability.  Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 500 (Tex.
1995); LMC Complete Auto., Inc. v. Burke, 229 S.W.3d 469, 478 (Tex. App.CHouston [1st Dist.] 2007,
pet. denied).  Thus, expert testimony that is not based on reasonable medical
probability but instead relies on possibility, speculation, or surmise provides
no evidence of causation.  Havner, 953 S.W.2d at 712; Schaefer,
612 S.W.2d at 204-05.  Reasonable probability is determined by the substance
and context of the opinion and does not turn on semantics or the use of a
particular term or phrase.  Crye, 907 S.W.2d at 500.








We,
therefore, review Dr. Cooke=s
testimony to determine whether his testimony on the cause of Marks=s chondromalacia was
admissible expert testimony.  Dr. Cooke graduated from the University of Texas
Medical Branch in Galveston, Texas.  He did a transitional internship for one
year at the University of Mississippi Medical Center and then did an orthopedic
surgery residency for four years.  Dr. Cooke joined the United States Air Force
and served as a staff orthopedic surgeon at Tyndall Air Force Base in Panama
City, Florida.  During his last year of active duty, he served as the chief of
orthopedic services at Tyndall Air Force Base.  Dr. Cooke then went into
private practice as an orthopedic surgeon in Abilene, Texas.  At the time of
testifying in this case, Dr. Cooke had been in private practice in Abilene for
eight and one-half years.

Dr.
Cooke said that he had not testified as an expert witness in any other cases
and that he had not testified in any workers=
compensation matters.  He also said that he was not authorized or credentialed
through the Commission to do impairment rating exams.  Dr. Cooke testified
that, as a treating physician, his job was to take care of patients and was not
to determine causation of medical conditions.

Dr.
Cooke testified that he probably did between twenty and twenty-five surgeries a
week and that probably at least half of the surgeries were to the knee.  He
also testified that chondromalacia is softening of the cartilage and that it
has varying degrees.  Dr. Cooke had often seen chondromalacia in his years of
practice as an orthopedic surgeon, and he testified that he was qualified to
diagnose and treat chondromalacia.

Marks
first saw Dr. Cooke on February 24, 2004.  Dr. Cooke took a history from
Marks.  Marks told him that he had broken up a fight at school between two
girls.  Marks also told him that he had been kicked and had sustained a
twisting injury to his knee.  Dr. Cooke performed a physical examination of
Marks on February 24, 2004.  At that time, Dr. Cooke diagnosed Marks with early
osteoarthritis with perhaps a recurrent tear of the medial meniscus and
probably some arthrofibrosis in the anterior compartment.  During his
testimony, Dr. Cooke explained the process for determining a diagnosis.  He
said that he relied on the history given by the patient, the physical
examination, and available objective data.  He said that, as per standard
medical practice, a diagnosis may change over time as additional information is
received.  Dr. Cooke testified that his diagnosis in this case changed as he
received more information.








Dr.
Cooke testified that, in his opinion, blunt force trauma that Marks sustained
to his left knee during the April 11, 2003 incident caused the chondromalacia
in the patella and the chondromalacia in the medial femoral condyle.  Dr. Cooke
identified a number of factors supporting his opinion.  Dr. Cooke testified
that medical literature, including the book, Orthopaedic Sports Medicine,
Principles and Practice, supported his opinion.  See 1 Jesse C.
DeLee, M.D., and David Drez, Jr., M.D., Orthopaedic Sports Medicine,
Principles and Practice, ch. 2 (1994).  Dr. Cooke said that a significant part
of his opinion was based on the fact that Marks had not had any knee pain
before the April 11, 2003 incident.  He also said that the physical examination
is of paramount importance in determining a diagnosis.  He also said that there
was a significant temporal relationship Ain
terms of his injury to the time of his first surgery and progressively, until
the time I saw him@
and that A[a] problem
magnified over time will get worse.@ 
Dr. Cooke also testified that his opinion was based on the basic science of
cartilage injury.

Dr.
Cooke also testified that the objective data supported his opinion.  He said that
Dr. Funk=s
surgery revealed a visible chondral injury, which evidenced blunt trauma to
Marks=s knee.  Dr.
Cooke said that the surgical pictures dated May 22, 2003, from Dr. Funk=s surgery showed evidence
of chondromalacia of the patella and chondromalacia of the medial femoral
condyle.  When Dr. Cooke performed the surgery on Marks=s left knee on March 24, 2004, he found a
progression of Marks=s
chondral injury.  Dr. Cooke said that he could not answer whether Marks had any
chondromalacia in his knees before the April 11, 2003 incident; however, he
said that Marks related no symptoms before the incident and that there was no
medical evidence that Marks had any problem with his left knee prior to the
injury date.  Dr. Cooke also testified that the April 11, 2003 work injury
caused damage or harm to Marks=s
left knee because it caused chondral injury to the patella and to the medial
femoral condyle.








AISD
asserts that Dr. Cooke was not qualified to testify as an expert witness on the
causation of Marks=s
knee conditions.  Dr. Cooke=s
testimony established that he was an experienced orthopedic surgeon.  As an
orthopedic surgeon, he treated knee injuries and performed multiple knee
surgeries each week.  He had often seen chondromalacia during his years of
practice.  He was aware of the causes of chondromalacia.  Dr. Cooke took a
history from Marks, reviewed some of the medical records relating to Marks=s prior medical treatment,
examined Marks, and performed the second surgery on Marks.  Dr. Cooke=s testimony showed that he had knowledge, skill, experience, training, or
education regarding causation of chondromalacia that qualified him to give an
opinion on the causation of Marks=s chondromalacia.  The fact that Dr. Cooke=s job duties as a treating
physician did not include determining causation issues did not disqualify him
from testifying as an expert witness in this case.  Nor did the fact that Dr.
Cooke had not previously testified as an expert witness disqualify him from
testifying as an expert witness in this case.  Based on the evidence, the trial
court did not abuse its discretion in concluding that Dr. Cooke was qualified
to give expert opinion testimony on causation.  See Mem=l Hermann Healthcare Sys.
v. Burrell, 230 S.W.3d 755, 762-63 (Tex. App.CHouston
[14th Dist.] 2007, no pet.).

AISD
argues that Dr. Cooke=s
causation testimony was unreliable for a number of reasons: (1) that he based
the opinion Asolely on
unsubstantiated assumptions, rather than an actual review of relevant medical
records@; (2) that he
used flawed reasoning and methodology because he based the opinion Aprimarily on the temporal
relationship between the injury and the diagnosis, and upon his incorrect
assumption that there [was] no evidence of any pre-existing condition@; and (3) that his
testimony was inconsistent with information contained in his earlier reports.

Dr.
Cooke reviewed some of Marks=s
medical records, including a report of an MRI taken in December 2003 and MRI
films taken in March 2004, during the time period that he was providing
treatment to Marks.  AISD=s
counsel questioned Dr. Cooke during his deposition testimony about additional
medical records, including a report from April 17, 2003 X-rays of Marks=s left knee and a report
from a May 1, 2003 MRI  taken of Marks=s
left knee.  During his testimony, Dr. Cooke explained in detail that the May 1
MRI, which was taken about three weeks after Marks sustained the trauma to his
left knee, provided further support for his opinion that the April 11, 2003
work incident caused the chondromalacia.  The April 17 X-ray report stated that
Marks had small bony spurs on the posterior margin of his left patella that were
consistent with degenerative change.  The Adegenerative
change@ referred to in
the X-ray report was not in reference to possible degenerative changes in the
cartilage.  Dr. Cooke explained that degeneration of the cartilage cannot be
seen on plain X-ray film and that chondromalacia cannot be diagnosed on a plain
X-ray.








            During
his testimony, Dr. Cooke addressed general causation and specific causation. 
In this case, the general causation inquiry is whether trauma to the knee can
cause chondromalacia; the specific causation inquiry is whether the trauma to
Mark=s left knee
caused his chondromalacia.  See  Havner, 953 S.W.2d at 714-15.  With
respect to general causation, Dr. Cooke testified that Chapter Two of Orthopaedic
Sports Medicine, Principles and Practice, and other medical
literature supported his diagnosis.  Chapter Two of Orthopaedic Sports
Medicine, Principles and Practice, explains that direct blunt trauma and
severe blunt trauma can cause cartilage damage and injury.  With respect to
specific causation, Dr. Cooke based his opinion that the April 11 incident
caused the chondromalacia on a number of factors, including the history he took
from Marks; the physical examination he performed on Marks; the temporal
relationship between the April 11, 2003 incident and the progression of the
chondromalacia; objective data in the medical records that he had reviewed; the
progression of the chondromalacia that he found during the March 24, 2004
surgery; Marks=s lack
of left knee pain before the April 11, 2003 incident; the basic science of
cartilage injury; and medical literature supporting his opinion.  The fact that
Dr. Cooke had not reviewed some of Marks=s
medical records before giving his deposition testimony did not render his
opinion unreliable.  The record shows that Dr. Cooke reviewed sufficient medical
evidence to render a reliable opinion.  A failure to review additional medical
records would go to the weight of Dr. Cooke=s
testimony rather than its admissibility.  See Burke, 229 S.W.3d
at 478 (The weakness of facts in support of an expert=s opinion generally goes to the weight of the
testimony rather than its admissibility.).

Evidence
of the temporal proximity, that is, closeness in time, between the April 11,
2003 incident and Marks=s
subsequently manifested physical conditions was relevant to the causation
issue.  Guevara, 247 S.W.3d at 668.  Thus, Dr. Cooke did not use flawed
reasoning and methodology in considering temporal proximity and basing his
opinion, in part, on the temporal relationship between the April 11, 2003 event
and the progression of Marks=s
chondromalacia.  Dr. Cooke did not base his opinion solely on the temporal
relationship between the April 11 injury and the diagnosis.  Rather, he based
his opinion on the factors set forth above.

Dr.
Cooke first saw Marks on February 24, 2004.  On that date, Dr. Cooke diagnosed
Marks with early osteoarthritis with perhaps a recurrent tear of the medial
meniscus and probably some arthrofibrosis in the anterior compartment.  Dr.
Cooke testified that, per standard medical practice, a diagnosis may change
over time as additional information is received.  He also testified that, after
receiving additional information in this case, he changed his diagnosis of
Marks to chondromalacia.  Dr. Cooke explained in detail the facts that led him
to change his diagnosis.  The fact that Dr. Cooke testified to a diagnosis that
differed from diagnoses contained in his earlier medical records did not make
his causation opinion unreliable.








The
causation testimony of AISD=s
expert, Dr. Van Hal, conflicted with Dr. Cooke=s
causation testimony.  A trial court=s
gatekeeping function under Rule 702 is not to determine whether an expert=s conclusions are correct,
but only whether the analysis used to reach them was reliable.  Gammill,
972 S.W.2d at 728.  For the reasons set forth above, Dr. Cooke=s testimony demonstrated
that his causation opinion had a reliable foundation.  Therefore, the trial
court did not abuse its discretion in concluding that Dr. Cooke=s causation testimony was
sufficiently reliable to be admitted into evidence.  See Burke, 229
S.W.3d at 478-79 (The court held that a neurosurgeon=s causation opinion B that an accident made it necessary for an
employee to undergo back surgeries B
was sufficiently reliable to support the jury=s
negligence finding.).

AISD
also argues that Dr. Cooke failed to establish a causal link between Marks=s April 11, 2003 injury and
his chondromalacia to a reasonable medical probability.  The facts discussed
above show the substance and context of Dr. Cooke=s
causation opinion.  The evidence showed that Dr. Cooke was an experienced
orthopedic surgeon who regularly treated knee injuries.  He was familiar with
chondromalacia; he had often seen the condition during his years of practice. 
As set forth in detail above, his testimony demonstrated that his causation
opinion was based on a number of factors.  A review of the substance and
context of Dr. Cooke=s
causation opinion shows that it was based on reasonable medical probability and
not on possibility, speculation, or surmise.

The
trial court did not abuse its discretion in admitting Dr. Cooke=s expert opinion testimony
that the April 11, 2003 incident caused Marks=s
chondromalacia in his left patella and the chondromalacia in his left medial
femoral condyle.  Therefore, we overrule AISD=s
first issue.

                                             Trial
Court=s
Impairment Rating Finding 

Dr.
Judd, the Commission=s
designated doctor, concluded that Marks=s
compensable injury included the chondromalacia.  Therefore, Dr. Judd gave Marks
a 15% impairment rating.  Dr. Robinson, the doctor chosen by AISD to
perform a required medical examination, concluded that Marks=s chondromalacia was not a
compensable injury because it was a preexisting condition.  Dr. Robinson
also concluded that Marks=s
impairment rating was 1%.  The trial court adopted Dr. Judd=s 15% impairment rating.  See
Section 410.306(c).








AISD=s second and third issues
are based on its contention that the trial court erroneously admitted Dr. Cooke=s expert causation
testimony.  In its second issue, AISD contends that, because Dr. Cooke offered
the only expert medical causation testimony and because Dr. Cooke=s causation testimony was
inadmissible, the evidence was legally insufficient to support the trial court=s finding that the
compensable injury included the chondromalacia.  Without evidence establishing
that the compensable injury included the chondromalacia, AISD contends that the
trial court erred in finding that Marks had a 15% impairment rating.  In its
third issue, AISD asserts that the trial court=s
erroneous admission of Dr. Cooke=s
causation testimony caused the rendition of an improper judgment.  We have ruled
that Dr. Cooke=s
testimony was admissible.  Therefore, we overrule AISD=s second and third issues.

However,
we will address whether Dr. Cooke=s
testimony was the only admissible expert medical evidence on causation.  The Crye
court stated the rule that an expert=s
opinion must rest in reasonable medical probability to constitute evidence of
causation.  Crye, 907 S.W.2d at 500.  The court then explained that A[t]his rule applies whether
the opinion is expressed in testimony or in a medical record, as the need to
avoid opinions based on speculation and conjecture is identical in both
situations.@  Id. 
Dr. Judd did not testify at trial.  However, AISD introduced Dr. Judd=s medical records into
evidence.  The records showed that Dr. Judd examined Marks on three occasions
to determine whether he had reached maximum medical improvement and to assess
Marks=s impairment
rating, if any.  The records also included a December 1, 2004 letter by Dr.
Judd to the Commission in which Dr. Judd disagreed with the conclusions of Dr.
Robinson, AISD=s
required medical examination doctor.

Dr.
Judd saw Marks on December 22, 2003, June 11, 2004, and September 18, 2004. 
Dr. Judd=s
records showed that he reviewed a substantial number of Marks=s medical records. 
Dr. Judd took a detailed initial history from Marks during the December
22, 2003 visit and updated the histories during the next two visits.  During
the initial history, Marks reported that he had broken up a fight and that a
girl had kicked him directly in the knee and thigh.  Marks gave a history of a
direct blow to the patella.  Dr. Judd performed physical examinations of Marks
during each of the three visits.








During
the December 22, 2003 visit, Dr. Judd diagnosed Marks, in part, with A[c]hondromalacia, severe,
patellofemoral joint with history of direct contusion to the patella at the
time of injury.@  Dr.
Judd=s impression was Athat [Marks] may have had
some mild or even moderate arthritis but that he took a direct blow to the
patella which severely damaged the patellofemoral cartilage at the time of the
accident.@  Dr. Judd
also stated that A[t]here
certainly may have been some pre-existing chondromalacia but this patient
appears to have sustained a direct contusion to the patella and therefore, a
significant exacerbation of any pre-existing chondromalacia.@  Dr. Judd concluded that
Marks had not reached maximum medical improvement on December 22, 2003.

Dr.
Judd=s June 11, 2004
examination followed Dr. Cooke=s
surgery.  After examining Marks, Dr. Judd diagnosed Marks, in part, with A[c]hondromalacia, medial
femoral articular surface, lateral femoral articular surface and patellofemoral
joint.@  Dr. Judd also
diagnosed Marks with post-traumatic arthritis and synovitis in the left knee. 
Dr. Judd did not believe that Marks=s
condition was age-related.  Instead, Dr. Judd concluded that Marks=s findings A[were] more compatible with
direct trauma and damage to the articular cartilage at the time of the
accident.@  Dr. Judd
again concluded that Marks had not reached maximum medical improvement on June
11, 2004.

During
the September 18, 2004 visit, Dr. Judd diagnosed Marks, in part, with
chondromalacia of the left patella and chondromalacia of the left medial
femoral condyle.  Dr. Judd stated that A[it]
is my feeling that [Marks=s]
chondromalacia and wear under the patella is directly related to the accident
in which he had a direct contusion to the patellofemoral joint.@  Dr. Judd concluded that
Marks had reached maximum medical improvement on June 29, 2004, and assigned a
15% impairment rating.  The impairment rating included ratings for
chondromalacia of the left patella and chondromalacia of the left medial
femoral condyle.

In
the December 1, 2004 letter, Dr. Judd responded to Dr. Robinson=s assessment that Marks=s chondromalacia was a
preexisting condition.  Dr. Judd stated that Dr. Robinson had Abasically decided to
totally ignore the fact that [Marks] was kicked directly in the knee and had
direct trauma to the patellofemoral joint as a result of the accident.@  Dr. Judd also stated that
A[c]ertainly routine
chondromalacia does take years to occur but the accident specifically caused
chondromalacia due to the direct kick to the knee and is therefore compensable
and is not something to just be ignored as being related to an injury without
any history of trauma.@








Dr.
Judd was the Commission=s
designated doctor to assess whether Marks had reached maximum medical
improvement and, if so, the percentage of his impairment, if any.  To serve as
a designated doctor, Dr. Judd was required to meet specific qualifications,
including training in the determination of impairment ratings.  See
Section 408.1225.  The evidence showed that Dr. Judd was an orthopedic
surgeon.  Dr. Judd=s
medical records established that his causation opinion was based on a number of
factors, including his review of Marks=s
medical records, the histories taken from Marks, and three physical
examinations of Marks.  The evidence established that Dr. Judd was qualified to
give expert opinion testimony on causation, and Dr. Judd=s medical records established that his
causation opinion was reliable and based on reasonable medical probability.

Dr.
Judd=s causation
opinion satisfied the requirements for admissibility of expert opinion
evidence.  As such, his opinion that the April 11, 2003 work injury caused
Marks=s chondromalacia
provided further evidentiary support for the trial court=s findings that the April 11, 2003 incident
caused Marks=s
chondromalacia and that Marks had an impairment rating of 15%.

                                                               This
Court=s Ruling

We
affirm the judgment of the trial court.

 

 

 

TERRY McCALL

JUSTICE

 

July 3, 2008

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]The legislature abolished the Texas Workers= Compensation Commission on September 1, 2005, and
transferred its responsibilities to the Texas Department of Insurance, Division
of Workers= Compensation.  Act of May 29, 2005, 79th Leg. R.S.,
ch. 265 '' 8.001(b), 8.004(a), 2005 Tex. Sess. Law Serv. 608. 
This case arose before the legislature abolished the Commission; therefore, we
will refer to the Commission in this opinion.